# Richmond.

## FISHBURNE AND WIFE V. FERGUSON'S HEIRS.

### DECEMBER 1st, 1887.

1. DEEDS—*Cancellation—Undue influence—Case at bar.*—In suit to cancel deed conveying real and personal property worth over $6,000 to defendants' intestate some months before his death, the evidence showed acts evincing insanity on the part of the grantor, who was nearly seventy years old, and that he suffered from mental and physical infirmities, and was subject to hallucinations; that the consideration—that the grantees would take care of and provide for him so long as grantor should live and remain with them—was grossly inadequate, and defendants' relation to decedent such as to bring him under their dominion:

HELD:

Fraud would be presumed from the circumstances, and where the evidence is conflicting, the decree of the trial court, setting aside the deed for want of legal capacity in the grantor to contract, is entitled to peculiar weight, unless error be palpable. Nor is such presumption repelled by the allegation that the deed was the consummation of a previously declared purpose, when the evidence establishes inconsistent declarations.

2. IDEM—*Insanity—Lucid intervals.*—When in such suit a general derangement of grantor's mind has been established, the party claiming a lucid interval, assumes the burden of proof thereof, which ought to go to the natural state of his mind and habits, and not merely to accidental interims and the degree of self-possession in any particular act.

3. IDEM—*Evidence—Non-professional witnesses.*—At trial of such suit the evidence of non-professional witnesses who approached grantor on business, that they found him *non compos mentis*, giving the grounds of their opinions, is admissible.

4. PRACTICE IN CHANCERY—*Issue out of—Case at bar.*—Awarding issues out of chancery rests on sound discretion, and is subject of appeal; but where the evidence is, as in this case, conflicting and producing doubt in the chancellor's mind, that discretion is rightly exercised.

Appeal from decree of circuit court of Franklin county, entered May 21st, 1885, in the chancery cause wherein Luke Ferguson, John I. Ferguson, and Elizabeth Tench, the heirs, and Henry S. Trout, the administrator of Isham M. Ferguson, deceased, were plaintiffs, and T. T. Fishburne and Callie L., his wife, were defendants. The object of the suit was to cancel a deed made by the decedent September 15th, 1880, to said Fishburne and wife, conveying a house and lot in what was then called Big Lick, now the city of Roanoke, and some personal property therein. An issue out of chancery was awarded. The jury returned a verdict against the defendants on the issue of mental incapacity, and the court approving the verdict, entered its decree cancelling said deed, directing a reference to a master to ascertain the rents and profits in excess of the improvements made by the defendants, and allowing a writ of possession to the plaintiffs for the property. Defendants obtained an appeal and *supersedeas* from one of the judges of this court. Opinion states the case.

*G. W. & L. C. Hansbrough* and *John W. Daniel*, for the appellants.

As grounds for reversal, the appellants assign the following, viz :

First. That the circuit court erred in overruling their exceptions to the seven instructions given the jury at the trial of the issues directed in the cause.

The entire set was in character, tendency, and effect misleading and improper. But objection is especially urged to the third, which is as follows :

" 3. The court instructs the jury that unless they believe from the evidence that the grantor in the deed in controversy, when he executed the same, had a legal capacity and sufficient understanding to comprehend clearly the nature of the business, and that he consented of his own volition to the execu-

tion of said deed, and that no fraud or undue influence was used to procure said contract, they must find for the plaintiff."

It seems self-evident that though this instruction on its face admits that I. M. Ferguson did execute the deed in controversy, yet it distinctly tells the jury that the deed is invalid in law unless the appellants satisfied their minds by evidence that at the time he executed it he not only possessed the requisite mental capacity, but also that he was not induced to execute it by any undue influence or fraud.   Such an instruction appears to bid defiance to two well-settled presumptions, to the full benefit whereof in this case the appellants are surely entitled, to-wit: 1. That all men are *prima facie* sane and possessed of the requisite mental capacity to dispose of their own property; and (2) that all transactions are deemed fair and honest until the contrary is established by proof.   Hence, the burden of proving either mental incapacity or undue influence and fraud rests wholly on the alleger thereof.   This instruction reverses those admitted rules of evidence and places the *onus* of proving I. M. Ferguson's mental capacity and his freedom from undue influence in this transaction on the grantees in the deed.   In the argument this instruction is defended by the assumption that the evidence adduced by the plaintiffs in this cause did establish that I. M. Ferguson had been in May, 1880, insane, and that therefore the burden of proof that he had the requisite mental capacity when he executed this deed on the 15th day of September, 1880, shifted to the shoulders of the appellants.   The question arises at once, then, was it within the province of the court to make such assumption, and to found upon it the authority to give the instruction?   It was for the jury to determine whether or not the evidence had established such insanity.   Should not the court have told the jury that, if from the evidence they believed that I. M. Ferguson had previous to the time of the execution of the deed been insane, then, unless from the evidence they believed, &c?  Thus only could the court escape the dilemma of having to

assume that a fact had been proved in order to justify its instruction.

But it is submitted that the rule in such cases as respects the shifting of the burden of proof is that where, from the evidence, the jury believe that at some time prior to the execution of the deed in controversy the grantor had been afflicted with *habitual, chronic, general,* or *continuous* insanity, then the burden shifts to the shoulders of the grantee, who is required to establish by proof that at the time of the execution of the deed the grantor had a lucid interval. Such belief in the minds of the jury, lodged there by the evidence, would be the proper basis for an instruction telling the jury that the deed was invalid unless from the evidence they believed the grantor had the requisite mental capacity. But is it for the court to assume the fact in order to warrant its instruction?

It is conceived that this view is sufficient to demonstrate the illegality of the instruction. However, it is proposed to pursue the subject further and inquire, unnecessarily perhaps, whether even the jury would have been warranted by the evidence in finding the fact whereby the burden of proving the mental capacity of Ferguson on the 15th day of September, 1880, was shifted to the grantees in his deed. And it is confidently submitted that the evidence does not show that I. M. Ferguson had ever been afflicted with habitual, chronic, general, or continuous insanity. Previous to May 6, 1880, no question had ever been raised as to his mental capacity. "He was always a curious kind of man and took up notions." So said McClanahan. Yet his sanity was unquestionable. About the sixth day of May, 1880, he had a spell of delirium, which lasted with more or less severity several weeks, including his first trip to Franklin. Under this spell he acted strangely, talked irrationally, had illusions and hallucinations. Again, on the tenth day of August, 1880, he had a similar spell that lasted (Dr. Webb says) about twenty-four hours. During the last days of August and the first days in September, 1880, he

had another spell that included his second trip to Franklin. Yet the unanimous and uncontradicted testimony of the four physicians was that his mental disorder was *temporary* not *permanent,* was symptomatic, or caused by conditions extraneous to the mind itself.

Dr. Webb attributed Ferguson's mental troubles to disease of heart and liver, caused by the use of liquor. Dr. Gale said Ferguson had delirium, caused by heart disease. Dr. White said Ferguson was "afflicted with melancholy attended with hallucinations, but that his mental disorder was temporary." White, Gale, and Baskerville, in answer to hypothetical questions put by plaintiff's counsel, said that a man with symptoms such as were described in Ferguson's case was afflicted with delirium that was temporary, and that the mental disorder would not continue to increase as the disease which caused it, increased. Gambill, Ferguson's partner and most intimate friend, ascribed Ferguson's condition and peculiar odd actions to intemperate use of liquor, and said that after he had ceased to use liquor, in July or August, his condition greatly improved. Witnesses, such as the two Andrews, his confidential clerks, and friends, Terry, McClanahan, Robinson, his farm manager, and others who saw him almost daily and had transactions with him in the summer and early autumn of 1880, testify that his mind was sound and capable in everything pertaining to business. On the other hand, who was the witness that testified that he was permanently or generally insane? Dr. Greer did not. He saw him on one occasion at Tench's store. He spoke only of his condition then as incapable of giving him any information about a matter which the Doctor thought lay within Ferguson's knowledge. The Franklin witnesses generally testify concerning strange sayings and doings of Ferguson in one or two interviews of brief duration. They tell of his "accidental condition on such occasions." They speak not of his mental state in general, or of his intellectual habitudes. None told of any incident either of speech or action which indicated

Argument.

permanent or general insanity.   Therefore, it is submitted that
not only was it not proved that he was afflicted with habitual,
general, chronic, or continuous insanity, but it was proved that
he had occasional delirium, temporary in its nature and occa-
sioned not by any inherent disease of the mind, but by the con-
dition of his body, which was relieved as the body was relieved
of the effusions and engorgement of the heart.

The same course of reflection clearly establishes that so
much of the instruction as told the jury that the deed was
invalid in law unless they were satisfied by the evidence that
he had *not* been induced to execute it by undue influence or
fraud, is equally bad.   Of the use of undue influence by the
defendants, or either of them, in procuring the deed, there
does not appear to be a scintilla of evidence.   The only cir-
cumstance referred to in the argument as furnishing the least
ground for suspecting undue influence, is that the grantor and
the grantees resided together and were on terms of affection.
But is not suspicion chased away by the admitted fact of the
high character borne by the grantees for integrity?   The keep-
ing off from a testator or grantor of his relatives is usually
considered a badge of the employment of undue influence.
Here there was nothing of the sort.   On the contrary, it was
proved by the plaintiffs that Fishburne had written to Frank-
lin, and even to Kentucky, to the relatives to come and see
Ferguson in his diseased state.

But it is contended that even if the instruction was bad, yet
it could not have prejudiced the defendants, as the verdict was
right on the merits.   Can it be determined that if the verdict
had been against, instead of for, the plaintiffs, that the circuit
court would have set it aside?   If not, then the verdict proba-
bly did influence the mind of the circuit court just as, doubt-
less, it and the circuit court's approval of it may influence this
honorable court.   And who can doubt that the jury in forming
their verdict were influenced by the court's telling them as the
guide for their action, that they must consider the deed invalid

in law, and must find for the plaintiffs, unless the evidence satisfied their minds that Ferguson possessed the requisite mental capacity on the 15th day of September, 1880, and had *not* been influenced unduly. Under the instructions they were to find for the plaintiffs in the absence of all belief as to Ferguson's mental capacity and freedom from undue influence. They could only find for the defendants after a state of mind had been actually formed by the evidence—thus reversing the order of things founded on the rules of evidence and the recognized principles of justice.

In this connection, it may be well to note one remarkable fact: The bill made no specific, definite, sufficient allegation charging that the deed had been procured by undue influence or fraud. Hence it was error to direct an issue as to that question. Afterwards, by the direction of the circuit court, assented to by the plaintiffs, the jury found for the defendants on that issue. So that position, if ever assumed by the bill, was subsequently abandoned. What matters it how weak may be the grantor's intellect, short of mental incapacity, provided there is no undue influence exerted? Here the question of undue influence ought to be regarded as wholly outside of this case, and the instruction concerning it pronounced altogether improper and misleading.

Second. It is next respectfully submitted that the circuit court erred · in its ruling whereby it refused to set aside the verdict on the ground that it was contrary to the law and the evidence, and refused to enter a decree in favor of the defendants, notwithstanding the verdict.

It is not denied anywhere that the verdict of the jury at the trial of an issue out of chancery stands upon a different footing from a verdict in an ordinary action at common law, and is entitled to less deference and consideration, and may be disregarded by the court and set aside on slighter grounds, the verdict being merely advisory of the conscience of the chancellor. A court may not, it is often said, set aside a verdict

merely because the court, if it had been on the jury, would not have concurred in giving such a verdict. Yet the chancellor, having examined the entire record of the case, may disregard a verdict rendered upon an issue directed by itself, simply on the ground that the verdict does not accord with the court's view of the right of the case, and may, and should in such event, enter up a decree notwithstanding the verdict and in opposition to it.

In this cause, in point of actual fact, the solitary issue before the jury was whether or not I. M. Ferguson possessed sufficient mental capacity to make the deed in controversy when he executed it, on the 15th day of September, 1880.

Of course the presumption is that he then had such capacity. Where is the evidence that he did not? He had not previously been afflicted with any habitual, general, chronic, or continuous insanity; and it did not devolve on the defendants to prove that he had a lucid interval on that day.

If, however, the defendants were required to prove that on that day he possessed the requisite mental capacity, it seems difficult to perceive that they failed to prove that fact.

Dr. Webb, his family physician, saw Ferguson at least ten times that month, and was always called in to see him whenever anything was the matter with him. This witness testified that he never saw Ferguson off of his mental balance but three times, to-wit: About the 6th day of August, 1880, and in January, 1881, for brief periods. Dr. Baskerville, his former physician and friend, testified that he conversed with Ferguson nearly all day about the middle of September, 1880; that he had heard rumors of his mental disorder; that he conversed with him with the direct purpose of ascertaining his mental condition; that he considered him as perfectly *compos mentis*, and would have signed a certificate to that effect had he been on a commission of lunacy. And in answer to a hypothetical question, grouping all the irrationalities of speech and action, all illusions and hallucinations that had been attributed to Fer-

guson by the plaintiff's witnesses, Dr. Baskerville said he would, notwithstanding all those things, have considered that on that day he was in the status of a sane man, capable of disposing of his property, and that he would not have hesitated to have entered into any contract with him.

Such, likewise, is the testimony of James B. Andrews, who transacted business for and with him on the 16th and 23d days of that month, and of Ammen, Gambill, W. K. Andrews, J. R. Fishburne, and others, who saw him and conversed with him every day.   None said that they would not have contracted with him at that time on what they themselves perceived of his condition; though some expressed a doubt and hesitation about making a large contract with him only on account of what they had heard others say of his situation, or, as in the case of Dr. Webb, on account of his professional relations, which might possibly subject his conduct to suspicion and criticism.   Barksdale, the notary and scrivener of the deed of the 15th day of September, 1880, a disinterested and uncontradicted witness of more than ordinary intelligence, and W. K. Andrews, a witness equally disinterested, uncontradicted, and intelligent, who witnessed the execution of the deed by Ferguson and attested his signature at his request, both of whom had every opportunity to observe, ascertain, and know the mental status of Ferguson, both testified that he was on that day perfectly rational and capable of understanding the nature, purpose and effect of the deed and of executing it.

Comment is made in the argument upon the fact that Ferguson desired witnesses to the transaction, so far as his own acts were concerned, and not as to the other parties.   As to this, the record shows that this was one of Ferguson's " odd ways," not peculiar to that period of his life, but common with him at other periods.   W. K. Andrews also testifies as follows : " I witnessed the agreement of the 27th day of March, 1872, between I. M. Ferguson and J. M. Gambill.   It was I. M. F.'s habit to have papers attested which did not need attestation.

I have witnessed such at his instance, such as receipts for money."

On the 21st day of September, 1880, Andrews discounted a note of $1,000 for I. M. F., who endorsed it. It was one of the three notes given I. M. F. by Fishburne Bros. in part for the price of the tobacco factory that day conveyed by I. M. F. to them by a deed which has never been assailed. Andrews wanted 8 per cent. discount, but I. M. F. would allow only 6 per cent. About this time I. M. F. purchased of Andrews a watch, and borrowed his chain, which watch he took to Kentucky as a present to a nephew, and brought back the chain, and on his return restored it to Andrews. Much comment was made on the testimony of Barksdale. No wonder. It is right in point and most vitally important, and naturally enough has been critically scrutinized and desperately assaulted by the plaintiff's counsel. It is hard to perceive that there is anything amiss about it. The witness was entirely void of interest or bias so far as appears from the record. His testimony, like that of W. K. Andrews, was right to the issue, bearing on the execution of the deed and the mental condition of the grantor at the very nick of time.

Barksdale testifies that then and there I. M. F. was perfectly rational, understood what he did, had the deed prepared according to his own ideas and wishes, and executed it when it had attained the form he desired it to take, even in all the *minutiæ* of its details. True, he says, that Fishburne told him that Ferguson desired him to write an instrument between him and Fishburne and wife, and told him the purpose of the instrument, and *may have given* him some memorandum, but told him to go to I. M. F. and he (I. M. F.) would give him the data. That witness went to I. M. F.'s house and saw him; that I. M. F. gave him the substance of what he wanted, and that he wrote it down, and afterwards wrote it out in full, and read it to him; that he was not satisfied. Witness had reserved a room in the house, but had not designated the room. That

witness re-wrote the deed. That at the store I. M. F. had it interlined that he "should furnish the feed for his own horse, and pay his own medical bills." That I. M. F. then signed the deed at his store in the presence of Andrews and witness, and that witness then took it to Fishburne and wife, who also signed and acknowledged it. It would appear impossible to discern in these proceedings of Ferguson anything indicative of mental unsoundness. There only is evinced the caution of a sharp old business man, such as the witnesses all describe I. M. F. to have been.

Great importance was sought to be given to an apparent inconsistency between Barksdale's statement and a sentence of the joint answer of Fishburne and wife to the plaintiff's bill. There they say: "And so far from employing any influence to induce him to execute the deed of conveyance which is prayed to be annulled, I. M. F. caused the notary to prepare it without consulting these respondents."

Surely, whatever construction may be put upon these words, taken alone, or in connection with Barksdale's testimony, they certainly have no bearing whatever on the issue as to the mental capacity of Ferguson. As to their bearing on the issue of undue influence, if such issue was sufficiently made and had not been abandoned, common charity should induce one to construe words in the best sense, and not in the very worst, especially as Fishburne and wife have had, and by no means could have had the least opportunity to explain them. They proved, and it has been on all hands admitted, that this gentleman and lady are persons of an excellent character, wholly inconsistent with the perpetration of anything reprehensible. And justice and wisdom demand that those words "without consulting the respondents," be given, as they are certainly susceptible of it, a construction correspondent with their character and far remote from inculpating them on mere inference with the commission of a crime.

It was on the 17th day of September, 1880, that I. M. Fer-

guson, of his own suggestion, proposed to J. R. Fishburne to take the deed of the 15th to Salem and get it recorded, telling him he had given "Tip and Callie" his house and lot, and that he could read it if he chose, and that he did read it and have it recorded.

It was on the 21st day of September, 1880, that I. M. Ferguson told James Fishburne that he had deeded his house and lot to "Tip and Callie," and that they were to take care of him the balance of his life; and said that "*they might have a good bargain of it, but that it might turn out a very hard bargain to them.*"

Please note well the italicised words. They bear on the question of "adequacy of price." They manifest beyond controversy that Ferguson considered the contract as *a contract of hazard.*

Please observe the testimony of L. B. Taylor. In April, 1880, I. M. F. told witness he wanted to give his house and lot to Callie Fishburne. Also the testimony of his wife. Both of these boarded with I. M. F. She says that in April, 1880, she heard I. M. F. say that he was going to give Callie Fishburne his house and lot to come and take care of him. J. T. Childress testifies that I. M. F. told him that he was going to give to T. T. Fishburne and wife his house and lot, and that afterward he told him he had given it. D. L. Coon says that I. M. F. told him in February, 1880, in the presence of his wife, that he had sold his factory, which was on the adjoining lot, to T. T. Fishburne, and that Fishburne ought to have his house and lot also, as he could not well get to the back lot without his house and lot, and said he always intended to give the house and lot to Callie Fishburne at his death; that witness boarded with I. M. F. six or eight months, and that I. M. F. always treated Callie Fishburne as a relative and as a member of his family, and very affectionately. Others testify similarly. But it is only necessary to mention John P. Turner. This witness testified that early in April, 1880, I. M. F. told him "to tell T.

T. Fishburne that if he and his wife will break up house-keeping at their house and come and take care of me I will give them my house and lot in Big Lick." Witness says, further, that he told Fishburne, and that Fishburne accepted the proposition and moved into I. M. F.'s house. Witness adds that in November, 1880, after I. M. F.'s return from the West, he said to witness: "I have let Gambill have my farm and I have given Callie and Fishburne the house and lot, which I told you last spring I would do, and they are to take care of me."

But, notwithstanding all this evidence and much more of a corroborating character, making, it would seem, a chain of adamantine strength, it has been contended that I. M. Ferguson had not sufficient mental capacity to dispose of his property, and that his deliberate and solemn deed of the 15th day of September, 1880, should be annulled on account of alleged lack of mental capacity! In opposition to the apparently over-whelming array of evidence which, in part, has been here summarized, going to demonstrate that the deed was made in accordance with his oft-expressed previous declarations of intention so to do, and that after he had made it, he repeatedly referred to it as having been done, all established by disinterested and uncontradicted witnesses, it is objected that those witnesses, in their several testimonies, differed as to the precise language used in that connection by I. M. Ferguson—some saying he said he meant "to give the house and lot to Callie"—some that he meant "to deed the house and lot to Fishburne and wife," &c., &c.; this contention is urged and it is insisted that their testimonies go for nought and must not be regarded.

This sounds strangely; because, is it not generally observed that "dissimilarity in immaterial details is indicative of substantial truth," and that "exact uniformity in details affords grounds to suspect collusion and falsehood?"

In substance, these numerous witnesses agree in establishing the important statement that I. M. Ferguson expressed an

intention that Fishburne and wife should have his house and lot at his decease. The details are unimportant, and contrariety as to them is immaterial.

Further, to break the force of this evidence, it is intimated that one of the most important of these witnesses (John P. Turner) was impeached. Is not that a mistake? It is true an effort was made to diminish his credibility by proving that since the institution of this suit, Turner made to John S. Hall an unsworn remark which, it is argued, was inconsistent with the tenor of his testimony on oath. This remark Turner denied all recollection of—and one witness testified that he heard him make it. Corroborated as Turner's testimony on oath in this case undoubtedly was by several witnesses and circumstances, it cannot be seriously contended that the credibility of his testimony has been impaired and much less that he stands as an impeached witness.

*Samuel Griffin* and *Peter Dillard*, for the appellees.

LEWIS, P., delivered the opinion of the court.

This was a suit in equity in the circuit court of Franklin county, to cancel a conveyance made in September, 1880, by Isham M. Ferguson, since deceased, of certain real estate situate in Big Lick, now the city of Roanoke. After many depositions had been taken in the cause, the court directed the following issues to be tried by a jury, namely—

1. Whether the deed in question was obtained by the defendants, Fishburne and wife, the grantees therein, by fraud or undue influence; and, 2, whether or not, at the time the deed was executed, the grantor was incapable by reason of disease, old age, or other cause, of clearly understanding its purport and object; upon the trial of which issues, the complainants were given the right to open and conclude.

After hearing the evidence, the jury returned a verdict for

the complainants on both issues.   But, at the suggestion of the
court, assented to by counsel, that the evidence showed the
defendants to be of good character, and that the object of the
complainants would be as well accomplished by a finding in
their favor on the second of the issues alone, the jury amended
their verdict, so as to find for the defendants on the first, and
for the complainants on the second.  The defendants after-
wards moved the court to set aside the verdict, and to decree
in their favor, notwithstanding the verdict, but the court over-
ruled the motion, and entered a decree cancelling the deed, and
ordering possession of the property in controversy to be sur-
rendered to the complainants.   From this decree the defend-
ants appealed.

It does not appear from the record that objection was made
by either party in the court below to the awarding of an issue;
but the appellants now contend that the action of the court
in this particular was erroneous.   We are of opinion, however,
that this position is not well taken.   This court has repeatedly
decided that the awarding of an issue out of chancery rests in
sound discretion, subject to review on appeal.   When the evi-
dence is contradictory, producing doubt. in the mind of the
chancellor, he may always direct an issue, for the purpose of
informing his conscience, and he may approve the verdict and
act upon it, when rendered, or, if dissatisfied with it, he may
set it aside and direct another trial of the issue, or he may
decide the cause contrary to the verdict, without the aid of
another jury, if in his judgment the law and the evidence
requires it, for the verdict is merely advisory.   In cases of
doubt and difficulty, an issue is directed, because a public
examination of the witnesses, where they can be seen and
heard and subjected to the test of cross-examination, ordina-
rily affords better means of arriving at a correct conclusion
than a perusal of the evidence on paper, especially where the
credibility of witnesses is involved.   And in view of the volu-
minous and contradictory evidence in the present case, the cir-

cuit court rightly exercised its discretion in directing an issue. *Stannard* v. *Graves*, 2 Call, 369; *Samuel* v. *Marshall*, 3 Leigh,. 567; *Wise* v. *Lamb*, 9 Gratt., 294; *Powell and wife* v. *Manson*, 22 *Id.*, 177; *Mettert's adm'r* v. *Hagan*, 18 *Id.*, 231; *Almond* v. *Wilson*, 75 Va., 613; *Crebs* v. *Jones*, 79 *Id.*, 381; *Watt* v. *Starke*, 101 U. S., 247.

The next and principal question in the case is, whether there was error in refusing to set aside the verdict, and in decreeing for the plaintiffs. And the solution of this question depends upon the proper conclusions to be drawn from the evidence. As is usual in like cases, the evidence is conflicting, and, in addition to this, the credibility of one or more of the most important of the defendants' witnesses is assailed, so that the verdict and the decree rendered in accordance therewith, are entitled to peculiar weight. Indeed, as was said in *Almond* v. *Wilson, supra,* to reverse the decree would be an unusual exercise of appellate jurisdiction, and in violation of the long established practice of the court, unless error be palpable. And in *Snouffer's adm'r* v. *Hansbrough,* 79 Va., 166, the rule is stated in terms not less strong.

There is a great mass of testimony in the case, covering several hundred pages of the printed record, and to review or analyze it all, would be both tedious and unnecessary. We have carefully examined it, however, and are satisfied there is no error in the decree. The case in substance is simply this:

On the 1st of April, 1881, Isham M. Ferguson, of Roanoke, departed this life, childless and intestate, leaving two brothers and a sister, his heirs at law. Afterwards, one of the brothers assigned his interest in the estate to a third party, who together with the heirs whose interests had not been assigned, were the complainants in the court below. On the 15th of September,. next preceding his death, the said Ferguson conveyed to the defendants, Tipton T. Fishburne and wife, the appellants here, his dwelling-house, out-houses, and six acres of land thereto attached, situate in what was then the town of Big Lick. The

deed also embraced all the furniture in the house, but reserved for the grantor's use a certain designated room in the dwelling-house and the furniture therein during his life. The consideration for this conveyance, as expressed in the deed, was that the grantees would take care of and provide for the grantor, medical bills excepted, so long as he should live, or remain with them. It was also stipulated that the grantees would shelter the grantor's horse, and have it cared for, he to supply the necessary food, and that the room reserved by the latter should not be used or occupied by any one else, unless by mutual consent of all parties. The grantor's signature and acknowledgment of the deed were witnessed by W. K. Andrews and T. F. Barksdale; there were no witnesses to the signatures and acknowledgment of the grantees. The value of the real estate was about $6,000; the value of the personalty does not appear.

At the time the deed was executed, the grantor had reached the age of nearly seventy years, and is described as being "fatally diseased," and physically · a wreck. For sometime prior thereto, he had been suffering from a combination of heart and liver disease, which in course of time affected his mind. On the 1st of April, 1880, his wife died, to whom he had been long married, and to whom he was much attached. Her death, superadded to his bodily infirmities, had a most depressing and injurious effect upon him. His disease, which chiefly caused his mental troubles, steadily grew worse until his death. This we are told by Dr. Webb, who for years was his physician, and who is one of the principal witnesses for the defendants. The same witness also testifies that he first discovered that the decedent's mind was unbalanced, early in May, 1880, a few weeks after his wife's death; that about that time, he became the victim of delusions; that he imagined persons were plotting against him, and at times became violent without provocation, so much so, that the witness deemed it prudent

to advise those around him not to leave a weapon or anything within his reach with which he could hurt himself or others.

Many other witnesses testify to the same effect, and especially to the great change in his condition immediately after the death of his wife. Previous to that event, he had been a man of strong will, self-reliant, and active and prudent in the management of his affairs, accumulating an estate worth, perhaps, twenty thousand dollars. After that time, according to much of the evidence, he was not capable of transacting business at all. He became moody; often passed his friends without apparently recognizing them, and when he spoke at all, it would often be in monosyllables. When spoken to on even trivial subjects, he would often say "hush, they will hear you; the mountains are full of telephones," and make other like incoherent remarks. He would say there were "haunts," and often said he could see stars when none were visible. He believed that engines had been put under his house by negroes, with which to blow him up; that robbers armed with pistols were concealed in the yard, and that his life was in danger from them. On one occasion, he fastened a red ribbon to the sign at the store of Ferguson and Gambill, in Big Lick, which he declared was his flag, and that he intended to defend it. And many other contemporaneous acts and sayings on his part, evincive of insanity, are mentioned in the evidence.

In May, 1880, by the advice of his physician, he visited Franklin county, where his sister and many of his friends and relatives lived, it being hoped that a change would benefit him. At that time, says Dr. Webb, he was "*unquestionably insane,*" and in this opinion, numerous witnesses emphatically concur. Among his delusions was the idea that his niece, who spent some time in the house with him, had been a subject of scandal, and he often spoke of it. This greatly annoyed the young lady, who testifies that she spoke to Mr. Fishburne, one of the defendants, on the subject, who told her not to mind it, that

*every one knew the old man was crazy*, and no one would think anything about it. About the same time, he (Fishburne) addressed a postal card to Otis M. Tench, a nephew of the decedent, living in an adjoining county, upon which he wrote as follows:

"DEAR OTIS:

Mr. Ferguson seems to be growing worse, and you or one of your brothers will be compelled to come over and stay with him, as it will never do to let him be alone, and he has taken a notion to go to the springs. He has not stayed here for three nights, and I don't think he wants to stay here at night. Come as soon as you can.

Yours,

T. T. F."

It appears that a few days after the death of the decedent's wife, the defendants, at his request, gave up their house in Big Lick, in which they were living, and went to live with him, and to keep house for him, and that they were living with him when the postal card above mentioned was written. Mrs. Fishburne, the female appellant, was a neice of the decedent's wife, and, when a young lady, had lived with him and her aunt; but how long, and in what capacity, she lived with them, does not distinctly appear. It is, indeed, alleged in the petition for appeal, that she was their adopted daughter, but of this there is no satisfactory proof in the record.

Numerous witnesses were examined as to the decedent's mental condition during his visit to Franklin county, which lasted several weeks. And the great weight of this evidence is, that he was then insane and not competent to understand or transact business of any kind. That he had lucid intervals, there is no doubt, but all who approached him on matters of business, as several of the witnesses did, testify that they found him *non compos mentis*. All the non-professional witnesses who knew him most intimately, concur in saying that he was insane,

and they give the grounds upon which they based their opinions. This evidence was clearly admissible, and entitled to great weight. *Conn. &c., Ins. Co.* v. *Lathrop,* 111 U. S., 612, and cases cited. And that his mind continued unbalanced, with occasional lucid intervals, until his death, the evidence, we think, shows beyond a doubt. It appears that he again visited Franklin county in August and September of the same year, when his mental condition was even worse than at the time of his visit in May. This is shown, apart from the evidence for the plaintiffs, by the testimony of the defendants' witness, Clinkinpeel, who testifies that he saw him on the 7th of September, about one week before the deed in question was executed, and that he did not then consider him capable of making a deed, and that he would not have accepted a deed from him on that day, though he had previously testified that when he saw him in the month of May, he considered his mental condition good—" good as it ever was."

The deed was written by the subscribing witness, Barksdale, the notary who took the acknowledgments, and who, as a witness for the defendants, gives the following account of it. He says that on the day of its execution, he was approached by defendant, *Tipton T. Fishburne,* who told him that Mr. Ferguson wished him (witness) to write an instrument between himself (Ferguson) and Fishburne and wife; that he told him the purpose of the desired instrument, and also to go and see Ferguson; that the necessary data was furnished witness by both parties, and that he then drew a deed embracing, as he supposed, the wishes of all parties. Yet the answer denies that the defendants, or either of them, were consulted, or were in any manner instrumental, in the making of the deed. The same witness also testifies that when he took the deed to Ferguson and read it to him, he objected to it on the ground that he wanted the room reserved for him designated. Another deed was thereupon written by the witness in place of the first, and when shown him and read to him, he again objected, say-

ing he wanted it stated in the deed that he was to furnish his own horse food, and to pay his own medical bills, and that he was not to take any one into the house who was disagreeable to the defendants. Another deed was accordingly written, which is the deed in question. It seems that the grantor's signature was witnessed by the subscribing witnesses at his request; but why he desired witnesses to the transaction, so far as his own acts were concerned, and not as to the other parties, is not explained, nor will we stop to speculate on the subject. The deed was then taken to the grantees, both of whom signed and acknowledged it; but it does not appear to have been at that time *delivered* to them, in the technical sense of that term; and upon this point also we are left without explanation.

The next we hear of the deed is through the witness, J. R. Fishburne, a brother of the male appellant, and who at the time in question took his meals at the house of the parties. He testifies that a few days after the deed was executed, the decedent, hearing him say he was going to Salem, requested him to take the deed and have it recorded, and that he went to his room, got it, and delivered it to the witness. The same witness also testifies that the decedent's mental condition was good. Indeed, he says he never saw his mind unbalanced at any time, though he boarded in the same house with him from the 18th of June, 1880, until his death in April, 1881; which goes to show, either that the witness saw but little of him, or that his views on the subject of insanity are peculiar.

Both of the subscribing witnesses testify that when the deed was executed, the grantor was in his right mind. And other witnesses who were examined for the defendants, give it as their opinion that he was at that time competent to contract. But that his mental faculties were so far restored, as that his mind had again become the safe guide of his actions, we are by no means satisfied from the evidence. And this it was incumbent on the defendants to prove, to entitle them to a decree; for although derangement when alleged must be

proved, yet if a state of general derangement be once estab-
lished, and a lucid interval is claimed to have afterwards pre-
vailed at a particular period, then the burden of proof is on
the party alleging such lucid interval, to show sanity and com-
petence at the period the act was done, and to which the lucid
interval refers.   And the evidence applying to such interval
ought to go to the state and habit of the person, and not to
the accidental interview of any individual, or to the degree of
self-possession in any particular act.   This was decided by
Lord Thurlow in the leading case of *Attorney-General* v. *Parn-*
*ther*, 3 Bro. C. C., 441, and such is the established doctrine.   1
Greenl. Ev., sec. 42; 3 Stark. Ev., 1703; *Hoge* v. *Fisher*, 1
Pet. C. C., 163; *Spencer* v. *Moore*, 4 Call, 423; *Wray* v. *Wray*,
33 Ala., 187; *Jackson* v. *King*, 4 Cow., 207; *Achey* v. *Stevens*, 8
Ind., 411; *Crouse* v. *Holman*, 19 Ind., 30.

Now, so far from this having been done by the defendants in
the present case, the terms of the deed itself go far towards
proving the contrary.   In the first place, the consideration was
inadequate.   The obligation to take care of an old man, then
tottering upon the brink of the grave, during the residue of
of his life, or rather for such time as he might choose to remain
with the grantees, was certainly not an adequate consideration
for property worth at the time more then six thousand dollars.
Indeed, it was grossly inadequate, and this fact, taken in con-
nection with all the circumstances surrounding the execution
of the deed, leads irresistibly to the conclusion, that not only
was there wanting on that occasion, the strength of will and
clear perception which characterized the grantor before his
bodily and mental infirmities came upon him, but that he had
no such appreciation or understanding of the nature and con-
sequences of the transaction, as to render it valid on his part.
The inference rather is, that his mind was under the controll-
ing influence of others, whose relations towards him were such
as to enable them to exercise dominion over him.   Thus, when
the first draft of the deed was read to him, he objected to it,

though he had only a little while before told the scrivener how he wished it prepared. And when the second draft was the same day read to him, he said he desired it inserted in the deed, among other things beneficial to the grantees and not embraced therein, that he was "not to bring anybody into the house who was disagreeable to Fishburne and wife."

These circumstances are full of significance, giving rise to the strongest presumptions against the validity of the deed. Here is an old man, enfeebled by many infirmities, only a few weeks before, as the defendants themselves prove, "*unquestionably insane,*" not only stripping himself for an insignificant consideration, of the title to his home, but willing to grant away the privilege of inviting into it his nearest and dearest friend, unless agreeable to the defendants, and this by means of a deed prepared from data furnished in part by one of the grantees. Does all this indicate an act of a man competent to contract, or of one, the light of whose intellect was feebly flickering, if not extinguished? To these questions but one answer, consistently with the record, can be given, and that is the answer which the jury gave, and which the judge who presided at the trial very properly approved. To answer otherwise, and to uphold the deed in question, would not only open wide the door to fraud and imposition upon the weak and dependent, but would be violative of the wisely established principles by which courts of chancery in such cases have been guided for centuries.

Nor is this all. There is other evidence in the record well worthy of consideration in this connection. It appears that soon after the date of the deed, the decedent visited his brother in Kentucky, accompanied by the male appellant, who left him there, where he remained for several weeks. While in Kentucky, he often spoke of the property in controversy, saying Fishburne claimed to have a deed for it, but he did not know how he got the deed; that he (Ferguson) had no recollection of signing it, and knew nothing about it. This appears from

the uncontradicted testimony of several witnesses, who further testify that during his stay in Kentucky his mind was evidently unbalanced, and that he was not capable of attending to business.

There is much more evidence which strengthens our conclusion in the case, but it is needless to refer to it. Enough has been already said to vindicate the correctness of the decree complained of.

The case of *Allore* v. *Jewell*, 94 U. S., 506, in which the deed there assailed was set aside, is not stronger than the present case. In the opinion of the court in that case, reference was approvingly made to the language of Mr. Justice Story, in *Harding* v. *Wheaton*, 2 Mason, 378, who said: "extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and although a contract in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it." It was accordingly declared to be settled law that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside, since from these circumstances, imposition or undue influence will be inferred.

This principle applies to the present case, and with peculiar force, in view of the fact stated by the scrivener in general terms that the memoranda from which the deed was drawn were furnished by both parties. It is true, one of the issues submitted to the jury was, whether the deed in question was

obtained by fraud or undue influence, and that upon this issue the jury ultimately found for the defendants. But this can be reasonably construed as nothing more than a finding that the deed was not obtained by actual fraud.

In the celebrated case of *Chesterfield* v. *Jansen*, 2 Ves., 155, Lord Hardwicke classified fraud under five heads, as follows: 1. Actual fraud, arising from circumstances of imposition, which is the plainest case. 2. Fraud which is apparent from the intrinsic nature and subject of the bargain itself, as where the bargain is such as no man in his senses and not under delusion would make on the one hand, and no fair and honest man would accept on the other. 3. Fraud which may be presumed from the circumstances and condition of the parties contracting; and this, he said, goes further than the rule of law which requires it to be proved, not presumed, and is wisely established in a court of chancery to prevent advantage being taken of the weakness or necessity of another, which knowingly to do is against conscience. 4. Fraud which is inferred from the circumstances of the transaction as being an imposition upon third parties, as in the case of marriage-brocage contracts. And 5. Fraud which infects " catching bargains."

The present case comes under the third of these heads ; for, although it is true that courts will not undertake to measure the size of people's understandings or capacities, and therefore mental weakness alone will not invalidate an instrument, (*Greer* v. *Greers*, 9 Gratt., 330), yet where, as we have seen, great weakness of mind concurs with gross inadequacy of consideration, or circumstances of suspicion, the transaction will be presumed to have been brought about by undue influence, and will be set aside.

Authority in support of this doctrine is abundant. Indeed, its correctness is not disputed, but it is contended that such a presumption is repelled in the present case by the fact that the deed in question was the consummation of a previously declared purpose on the part of the grantor, and much reliance in the

argument was seemingly placed upon this position. The record, however, affords little or no support for such a contention. In the first place, the evidence on the point is by no means consistent. Thus, one witness testifies that on a certain occasion, the grantor remarked to him that he intended " *to deed* " the property in controversy and certain other real estate to *Mrs. Fishburne,* the female appellant; while another testifies that, about the same time, he told him he intended " *to leave* " (*i. e.* devise) her the property in controversy; and still another says he told him he intended *to give* it to her : whereas the deed in question conveys it for a consideration to her and her husband jointly. Besides, it appears from the testimony of all these witnesses, except one—and that one was impeached—that these declarations of the grantor were made after the 1st of April, 1880. And, on the other hand, there is evidence for the complainants, showing that prior to that time, he declared that he had done a great deal for his " wife's kin," and that he intended his property for his " home people "—by which was meant, we presume, his blood relations.

But apart from this, there is another consideration already incidentally adverted to, which is equally decisive ; and that is one growing out of the relations subsisting between the parties at the time the deed was executed. The evidence shows that when the appellants went to live with the decedent, soon after the death of his wife, they went, not alone for the purpose of managing his household affairs, but as friends and companions, to cheer him in his loneliness, and to comfort and protect him. They, therefore, assumed towards him the most intimate and confidential relations—relations in which nothing is more natural, than that they should have gained his confidence, and acquired influence over him.

Now, the rule is that where one person stands in a relation of special confidence towards another, so as to acquire an habitual influence over him, he cannot accept from such person a personal benefit without exposing himself to the risk, in a

degree proportioned to the nature of their connection, of having it set aside as unduly obtained.    Adams Eq., 183.

And in 1 Story's Equity, sec. 329, *a*, the rule is even more strongly stated, as follows: "where the contract is between those who sustain, or have lately sustained, any intimate and confidential relation, the law presumes the existence of that superiority and influence on the one part, and that confidence and dependence on the other, which is the natural result of the relation, and will accordingly decree the cancellation of the contract, unless it appear affirmatively to have been equal and just."

The same doctrine is laid down with great force and clearness by Lord Crannorth, in *Smith* v. *Kay*, 7 H. L. Cas., 750, in these words: "My lords, there is, I take it, no branch of the jurisdiction of the court of chancery which it is more ready to exercise than that which protects infants and persons in a situation of dependence, as it were, upon others, from being imposed upon by those upon whom they are so dependent. The familiar cases of the influence of a parent over his child, of a guardian over his ward, of an attorney over his client, are but instances. The principle is not confined· to those cases, as was well stated by Lord Eldon, in the case of *Gibson* v. *Jeyes*, 6 Ves., 266, in which he says it is 'the great rule applying to trustees, attorneys, or *any one else.*' " Indeed, many of the cases hold that a transaction between persons occupying towards each other the relations above described, will not be permitted to stand, where the party subject to influence acted without independent advice. The recent case of *Kempson* v. *Ashbee*, 10 Ch. Cas., 15, decided in the English court of appeal in chancery, and referred to in the opinion of the court in *Allore* v. *Jewell*, *supra*, is a case of that description. See also, 2 Min. Insts., 597; *June* v. *Willis*, 30 Fed. Rep., 11, note; *Huguenin* v. *Basely*, 2 Lead. Cas. Eq., (marg. p.) 556, *et seq.*, and the notes, where the authorities are collected.

The only remaining question relates to the instructions given

to the jury, on the motion of the complainants, upon the trial of the issues. Of these there were seven. The real objection, however, is to the third, which is in these words: "The court instructs the jury that unless they believe from the evidence that the grantor in the deed in controversy, when he executed the same, had a legal capacity and sufficient understanding to comprehend clearly the nature of the business, and that he consented of his own volition to the execution of the said deed, and that no fraud or undue influence was used to procure said contract, they must find for the plaintiffs."

The defendants complain of this instruction, because, they say, it was calculated to mislead the jury into believing that the burden of proof was on them, and not on the assailants of the deed. We do not think the instruction is open to this objection, though it is quite true it might have been better expressed. But be that as it may, the result in any view is the same. We have seen that by their own evidence, it appears that shortly before the deed was executed, the grantor was insane; and we have also seen that the burden of proof was consequently shifted upon them to show that when the deed was executed, he had sufficient intelligence to understand it fully, and that he acted freely, if indeed, in view of the relations between the parties, and all the attendant circumstances, the transaction could be upheld at all. And hence no greater burden has been put upon them, than under the established rule of law, applied to the particular facts of the case, it was incumbent on them to assume. So that, even if the instruction be not strictly and technically correct, the defendants have not been prejudiced by it. Moreover, in passing on a complaint of errors in the trial of an issue out of chancery, the the court proceeds upon very different principles from those governing in an application for a new trial in an action at common law. In the former case, the rule as laid down by Judge Staples in *Powell and wife* v. *Manson*, 22 Gratt., 177, and recognized in *Snouffer* v. *Hansbrough*, 79 Va., 166, is that although

there may have been a misdirection, or evidence may have been improperly admitted or excluded, yet a new trial will not be granted, if upon a consideration of the whole case the verdict appears to be right.    And the reason is, that an issue out of chancery is a mere incident of the proceedings, the verdict, when rendered, being only advisory.    *Lamberts* v. *Cooper's ex'or*, 29 Gratt., 61;  *Hartman* v. *Strickler*, 82 Va., 225;  *Johnson* v. *Harman*, 94 U. S., 371;  *Watt* v. *Starke*, 101, *Id.*, 247; and cases cited *supra*.    It would, therefore, be manifestly unjust to reverse a decree for some merely technical error committed upon the trial of an issue, when the court can see from the record that the case has been rightly decided.

This rule applied to the present case, requires an affirmance of the decree complained of.

FAUNTLEROY, J., and RICHARDSON, J., dissented.

DECREE AFFIRMED.