# Wytheville

## JOHN H. LOHMAN, JR., EXECUTOR, ETC. v. LUCILLE S. SHERWOOD.

June 14, 1943.

Record No. 2567.

Present, All the Justices.

The opinion states the case.

*James G. Martin & Son*, for the appellants.

*W. R. Ashburn*, for the appellee.

HUDGINS, J., delivered the opinion of the court.

John H. Lohman, a lieutenant in the United States Navy, retired in 1922. While he was living in Portsmouth with his wife and two children, John H. Lohman, Jr., and Mary Lohman, he became estranged from his family. In an uncontested suit instituted in 1925, his wife obtained a divorce *a mensa*. In the same suit the court approved a voluntary settlement of the property rights of the parties and eliminated the marital rights of each in the property of the other. Neither party sought to enlarge the decree *a mensa* into an absolute divorce. Some time after the decree was entered, the wife was adjudicated to be *non compos mentis* and was committed to the care of her daughter, with whom she now resides.

After the divorce decree was entered, Lohman lived alone in Portsmouth until 1926 or 1927, when he and Lucille S. Sherwood began to live together. They continued to so live until November, 1939, when Lohman's two children had him removed to the Naval hospital in Portsmouth. Later his daughter took him to her home, where he died testate in March, 1940.

Lohman seems to have been frugal, living on his retired officer's pay and making substantial profits on investments. At the time of his death, he had accumulated a considerable estate, the exact amount of which is not disclosed in the record.

Lohman and Mrs. Sherwood seem to have been happy and contented during the thirteen years that they lived together. She kept the house, did the marketing, and was a close personal companion in his social affairs. Different witnesses, who were frequent visitors in the home, stated that Lohman was considerate, devoted and affectionate in his attitude toward Mrs. Sherwood and that she responded in kind. During the last years of his life she acted as his chauffeuse and nurse. She was kind to and considerate of Lohman's children, who were frequent visitors in the home, although they knew of the relations existing between Mrs. Sherwood and their father.

Lohman, in his last will, named his son as executor and divided all of his property between his two children, John H. Lohman, Jr., and Mary Lohman Perrot.

The executor and beneficiaries filed the bill in this cause, alleging that in 1939 their father was 67 years of age, physically weak and mentally incompetent; and that Mrs. Sherwood was an intelligent woman twenty years his junior, who, while "living in adultery with him," "by undue influence, and without consideration, stripped him of his property," described in the following instruments: (1) A deed bearing date March 24, 1939, conveying to Mrs. Sherwood three lots in the Bay View Beach section of Norfolk; (2) a deed bearing date July 31, 1939, conveying to Mrs. Sherwood the Sherwood Apartments on Ocean View avenue in Ocean View; (3) a bill of sale bearing date February 6, 1939, conveying to Mrs. Sherwood certain notes executed by Bessie G. Hanks, payable to Lohman, with payment secured by a deed of trust on real estate, which bill of sale was executed and acknowledged on August 1, 1939; (4) a general power of attorney dated July 6, 1939, authorizing Mrs. Sherwood to sell and convey Lohman's property,

check on his bank account and conduct any and all other business for him.

The bill also alleged that Mrs. Sherwood had converted to her own use more than $7,000, from the Seaboard Citizens Bank, and other funds owned by Lohman.

To this bill Mrs. Sherwood filed an answer admitting the execution of the instruments but emphatically denying that she had fraudulently, or by the exercise of undue influence, and, while Lohman was physically and mentally incompetent, illegally stripped him of property of any kind or description.

The case was referred to Richard W. Ruffin, one of the commissioners in chancery of the Circuit Court of the city of Norfolk, who was directed "to take evidence, inquire and report to the court" on each of the issues raised by the pleadings.

The commissioner found that early in the summer of 1939 John H. Lohman became mentally incompetent, and that all instruments executed or acknowledged after July 1, 1939, were invalid and all instruments executed prior to that time were valid. While the commissioner stated that the power of attorney dated July 6, 1939, was invalid, he found that Mrs. Sherwood had not illegally used the power of attorney for her own benefit. To this report each side filed exceptions. The trial court overruled the exceptions of the complainants to the report, sustained the exceptions of Mrs. Sherwood, and entered a decree declaring that Mrs. Sherwood was the legal owner of all property given or conveyed to her in the lifetime of the testator. From that decree this appeal was allowed.

The record thus presents a case in which a commissioner, who had the advantage of noting the demeanor of the witnesses on the stand and their manner of testifying, reached one conclusion, and the trial court, who did not have this advantage, reached an opposite conclusion on the same evidence.

The rule by which this court is guided in such cases was restated by Mr. Justice Gregory in *Roark* v. *Shel-*

*ton*, 169 Va. 542, 194 S. E. 681, in which it was held that the report of a commissioner is not as binding upon the court as a verdict of a jury, and that, when exceptions are filed, it is the duty of the court to examine the evidence, review the conclusions of the commissioner and determine whether or not the conclusions are supported by the evidence. If the testimony is conflicting and the commissioner's conclusions are supported by competent and unimpeached witnesses, the court should not set aside or disturb the report unless the weight of the testimony and the nature of the evidence is such as to make it clear that the commissioner erred.

Judge Prentis, in *Clevinger* v. *County School Board*, 139 Va. 444, 124 S. E. 440, 441, said: "It is fundamental, however, that notwithstanding the weight due to a commissioner's report and the respect which is accorded his findings, neither the trial court nor this court should avoid the duty of weighing the evidence when its sufficiency is fairly challenged. Neither in the trial court, nor here upon appeal, should any judgment stand if the record shows that it is unsupported by the testimony." The converse of this proposition is equally true; namely, if the findings of the commissioner are supported by credible testimony, then his findings should be sustained.

With these principles in mind we re-examine the record to ascertain whether there is sufficient substantial evidence to support the findings of the commissioner.

While Lohman lived in Portsmouth, he formed a close friendship with A. A. Bangel, an attorney, who, from 1925 to 1939, was his legal adviser. In 1932, at Lohman's request, Bangel prepared a will in which certain small specific devises and bequests were made to his daughter, Mary Lohman Perrot, and Mrs. Sherwood, and the residue of his estate was devised to Mrs. Sherwood for life and, at her death, to be equally divided between his two children, John H. Lohman, Jr., and Mary Lohman Perrot. Between 1932 and 1936, Lohman executed several other wills, in each of which he revoked the former will and limited his

gifts to Mrs. Sherwood to $3,000. Bangel kept no copies of these wills but two were found and filed as exhibits. In 1936 Lohman executed another will, in which he devised to Mrs. Sherwood her own note for $3,000, secured by a deed of trust on property that had been conveyed to her by her parents. In the same will he devised to his daughter a house and lot in Portsmouth, cancelled all indebtedness due him by Robert Perrot, the husband of his daughter, and named his son as executor. The residue of the property was not mentioned or described in this will. In March, 1939, at Lohman's request, Bangel prepared another will, in which all previous wills were revoked and in which he directed that his entire estate be divided equally between his children. His son was named as executor. This will was admitted to probate. John H. Lohman, Jr., qualified as executor and proceeded to administer on the estate of his father.

On October 23, 1939, Lohman and Mrs. Sherwood saw Bangel in his office. During this interview Bangel observed the physical and mental condition of Lohman and, on account of his mental condition, refused, as trustee, to execute a release to a deed of trust which was held by Lohman to secure the payment of certain notes. In the controversy which later developed over Bangel's refusal to execute a release, he ascertained that Lohman had executed a general power of attorney authorizing Mrs. Sherwood to transact all business matters for and in behalf of Lohman. When Lohman's children were informed of this fact, they instituted proceedings in the Corporation Court of the city of Norfolk in which Lohman was declared to be *non compos mentis*. Bangel was appointed his guardian.

Bangel, as guardian, with the aid of his attorney, James G. Martin, ascertained that, between December 27, 1938, and August 12, 1939, Lohman, for no valuable consideration, had transferred to Mrs. Sherwood real estate and personal property valued at approximately $40,000 and that, by a general power of attorney, she had been authorized to sell and convey any and all property owned by Lohman, to collect the rents and to draw at will on his bank account.

Bangel, as guardian, entered a suit against Mrs. Sherwood, charging her with fraud and undue influence in obtaining Lohman's signature to the papers in question. The right of Bangel, as guardian, to maintain the suit was questioned. Whether it was withdrawn or dismissed on demurrer is not clear from the record. At any rate, it was not decided on the merits, and immediately after the death of Lohman the present suit was instituted.

The controversy is between the testator's children, beneficiaries under his will, and the testator's mistress, who claims title to the property under instruments executed during the last months of the testator's life.

The circumstances under which the instruments in question were executed create a strong suspicion of undue influence. For 12 to 13 years immediately preceding 1939 decedent had supported Mrs. Sherwood in a reasonably affluent manner. He had given her small sums at various times, but he had managed his own property and, by his various wills, had made such provision as he deemed advisable for her in case of his death. On December 27, 1938, he made two substantial gifts but, in executing these deeds of gift, he had his regular legal adviser prepare the instruments. One conveyed a small house and lot to Mrs. Sherwood. The other was executed at Mrs. Sherwood's suggestion, conveying another small house and lot to his son. No attack is made upon either of these instruments.

Some time prior to March, 1939, decedent and Mrs. Sherwood drew plans and specifications for a home they expected to build on vacant lots on Bay View boulevard in Ocean View. A part of the material was purchased and placed on the lot prior to March, 1939. Mrs. Sherwood, in her own name, obtained a building permit from the Department of Public Works in Norfolk to construct this home, stating at the time that the cost would be approximately $4,000. On March 24, 1939, Mrs. Sherwood had the deed to these lots prepared by Joseph Morris, a real estate broker.

Morris stated that a few days after he had written the deed, Lohman thanked him for writing it and offered to pay

him therefor. At that time Lohman knew what property had been conveyed by the deed and the grantee named therein. Morris stated further that in 1928, when Lohman acquired these lots, he said he bought them for Mrs. Sherwood and he intended to build her a home thereon.

On March 31, 1939, two days after Lohman was admitted to the Parrish Memorial Hospital, he instructed his attorney, Bangel, to prepare his last will, whereby Lohman divided his entire estate between his two children. This will appears to have been executed during a lucid interval—at least complainants do not attack it. Indeed, they must concede its validity in order to claim under it. The commissioner pertinently stated in his report that, if the will was valid, it was reasonable to hold that the deed of March 24, executed seven days previously, was valid also.

Lohman acquired, in January, 1936, for $2,375 a house and lot on East Ocean View avenue, Ocean View, Virginia. He converted this building into apartments which he called the Sherwood apartments, and soon thereafter he and Mrs. Sherwood moved into one of the apartments and continued to reside there until November, 1939. On July 31, 1939, Mrs. Sherwood had Ernest L. Dyer, a reputable attorney who specializes in real estate, prepare a deed conveying this property to her. Dyer obtained all his information from Mrs. Sherwood and never saw or talked to Lohman about the matter—in fact, when testifying, he did not recall the circumstances under which the deed had been prepared. The deed was acknowledged on the same day by C. G. Mayes, a notary public. Lohman's signature appears on the deed not horizontally on the line drawn therefor, but diagonally across the page from left to right beginning on the next to the last line of the body of the deed and ending just above the top line of the jurat of the officer. This deed was not recorded until October 31, 1939, the next day after Lohman had been adjudicated incompetent. When Mrs. Sherwood was asked about the delay in recording the deed, she said: "That deed was drawn by Mr. Dyer, and I think it was delivered to me. I am not sure, but I think it was

delivered to me, and Mr. Lohman had it notarized, and he said, 'Lucille, don't sign it, and don't record it unless they get smart,' meaning John and Mary. He said, 'If anybody sticks their nose in our business go immediately and record it,' and after we had the court proceeding when he was carried down to court, then he said, 'Lucille, you go down and record that deed,' and Mr. Taylor (her attorney) told me to do the same thing."

These statements alone create a strong suspicion of the good faith of the witness in view of the fact that the alleged conversation took place between the witness and Lohman prior to the time either of the appellees questioned the mental capacity or the right of Lohman to transact his own business.

Mayes, the notary who took the acknowledgment to this deed, stated that he, at Mrs. Sherwood's request, took Lohman's acknowledgment while he was sitting in the car parked in front of Mayes' office, and that, at the time, Lohman appeared to him to be normal, otherwise he would not have acknowledged his signature. It does not affirmatively appear from any of the testimony except that of Mrs. Sherwood, that Lohman knew the property that was conveyed in the deed or the name of the grantee.

After Bangel qualified as guardian, he ascertained that Lohman carried no fire insurance on his buildings. Bangel immediately had the buildings insured, including the Sherwood apartments. In January, 1940, these apartments were destroyed by fire and the amount of the policy, $15,000, or its equivalent is now held subject to the order of the court in this cause.

The bill of sale attacked is dated the 6th day of February, 1939, and signed and acknowledged on the 1st day of August. Under this bill of sale four notes are conveyed to Lucille S. Sherwood. They are dated February 1, 1932, payable 1, 2 and 3 years after date, totaling $7,200, and executed by Bessie G. Hank, payments of which are secured by a deed of trust conveying certain real estate in the city of Norfolk to A. A. Bangel, trustee. The deed provides that, on the request of the maker, certain parts of the real

estate might be released upon payment to Lohman, or the holder, of a certain proportion of the purchase price. As the lots were sold off, a number of release deeds were executed by the trustee and Lohman, as holder of the notes. After this bill of sale was signed and acknowledged, part payments were made on the notes and release deeds executed. At least one of the release deeds was signed by Mrs. Sherwood, not in her own right but as attorney in fact for Lohman. Her action in receiving and handling these payments as Lohman's property is inconsistent with that of a bona fide owner of the notes.

On August 12, 1939, Mrs. Sherwood instructed Mr. Dyer to write the following letter, addressed to her, which was later signed by Lohman:

"For the past several weeks you have been building a home at 1835 Bay View Boulevard in the city of Norfolk, Virginia, the total cost of which I understand will be about $15,000.00.

"It was and still is my intention to give you sufficient money to cover the entire cost of said building, and I have from time to time either given you or authorized you to draw checks on my account in various sums for said building.

"The purpose of this letter is to evidence the fact that you have been authorized to draw checks on my account and that said sums were intended as a gift in token of appreciation for the many kindnesses and favors you have shown me."

Mrs. Sherwood took this letter from Dyer's office to her apartment and there obtained Lohman's signature, which appears to have been written diagonally two-thirds of the way across the paper. Mrs. Sherwood stated that Lohman instructed her to get this letter prepared because he wanted her to have written evidence of the fact that he was under obligation to complete the building of the home on Bay View boulevard for her. Several of Mrs. Sherwood's friends testified that Lohman showed the letter to them and told them that he had done this of his own accord for the

benefit of Mrs. Sherwood. These witnesses testified that they had visited Lohman and Mrs. Sherwood in their apartment at various times from January to October, 1939, and that upon each visit and each occasion Lohman appeared to be weak physically but alert and normal mentally. This testimony of these witnesses is not convincing.

The weight of the testimony clearly shows that Lohman began to show evidence of physical weakness in 1938. This condition grew progressively worse. He had little control of his kidneys and walked with difficulty.

There is little conflict in the diagnoses of the four physicians who attended him in 1939. They state that he was suffering with cerebral arteriosclerosis and that it was chronic, progressive and incurable. In addition, he was suffering from chronic diabetes, acidosis and myocarditis. Dr. Reynolds, his family physician, testified that for the first three or four months in 1939 he was apparently confused. He saw bugs and rats crawling on the ceiling and he had hallucinations and delusions.

Dr. K. W. Howard, over the protest of Mrs. Sherwood, was called in as a consulting physician. He first saw Lohman on March 26, 1939, and on March 29 Lohman was removed to the Parrish Memorial Hospital. There he "was mentally upset. He was delirious, and visually he would see rats. He talked more about rats running around the wall and wanted to get out and away from them more than anything else. He was just—had hallucinations. He could see little things and misinterpreted them." He had cerebral arteriosclerosis and was in a diabetic condition. His mental condition was completely abnormal. However, the spells were not continuous. "After he got in the hospital, he improved to some extent. At times he would be relatively collected. His general improvement through the time he was in the hospital was fairly well marked, so well—so much so that we allowed him to go home on April 11th. At that time, according to my notes, he no longer had the double vision. That is one thing I didn't mention awhile ago, delusions or hallucinations. His blood sugar was normal,

and he had no sugar in his urine. His heart change at that time was normal. His breathing at that time was still improved, but he had what we call changed Cheyen Stokes respiration. The rate will increase and rise up to a pitch and then he will stop breathing temporarily and it will pick up slowly again and go up more rapidly to longer breaths and quit breathing again."

Dr. Howard, Lohman's attending physician from November, 1939, until his death, testified that for two years prior to Lohman's death he had suffered with chronic arteriosclerosis, and that for at least a year prior to his death he had myocarditis; that during the latter period the patient had lucid intervals; and that in November, 1939, he was not as mentally confused as he was when he first saw him on March 26, 1939. Dr. Sterling Cooke, of the Naval hospital, and Dr. Redwood testified that in their opinion Lohman did not have sufficient mental capacity to transact any business for several months, perhaps a year, before he was admitted to the Naval hospital. Dr. Redwood, on cross-examination, was asked the following questions and gave the following answers:

"Q. After it was first manifested he might be suffering from an ailment of this type, his condition wouldn't be continuous, but he would have lucid intervals of various durations?

"A. You mean at the beginning?

"Q. Yes.

"A. Yes, I think probably he would because the symptoms are so gradual that frequently he might have slight symptoms this month and three or four months later those same symptoms would be more marked. Does that answer it?"

██ ██ The generally accepted test of testamentary capacity is that the testator must have sufficient mind and memory to understand the nature of his act in disposing of his property, and to know the extent of his property and the objects of his bounty. In some jurisdictions it is held that it requires less capacity to make a will than it does to make a deed.

*Jarrett* v. *Jarrett*, 11 W. Va. 584; *Nicholas* v. *Kershner*, 20 W. Va. 251; *Kerr* v. *Lunsford*, 31 W. Va. 659, 661, 8 S. E. 493, 2 L. R. A. 668. However, every case in which mental capacity is in issue must depend on the peculiar circumstances surrounding the execution of the instrument in question, as the facts in one case rarely serve to illustrate or elucidate another. *Greer* v. *Greers*, 9 Gratt. (50 Va.) 330.

■ "A reasonable test, suggested by several courts for the purpose of determining whether an infirmity operates to render a person incapable of binding himself absolutely by contract, is whether his mind has been so affected as to render him incapable of understanding the nature and consequences of his acts, or, more exactly, whether his mental powers have become so far affected as to make him unable to understand the character of the transaction in question." 28 Am. Jur., Insane and Incompetent Persons, sec. 66, p. 701.

■ We have held in numerous cases that no particular degree of mental acumen is to be prescribed as the measure of one's capacity to execute a deed. The question is answered when it is determined whether, at the time of the execution of the instrument, the grantor had sufficient mental capacity to understand the nature of the transaction he was entering into, and to assent to its provisions." *Ferguson* v. *Ferguson*, 169 Va. 77, 192 S. E. 774.

■ Courts do not undertake to measure the size of peoples' understanding or capacities and therefore hold that mental weakness alone will not invalidate an instrument. Yet where a great weakness of mind concurs with gross inadequacy of consideration or circumstances of suspicion, the transaction will be presumed to have been brought about by undue influence and will be set aside. *Fishburne* v. *Ferguson's Heirs*, 84 Va. 87, 111, 4 S. E. 575.

When Lohman, on December 27, 1938, executed the two deeds of gift, one to Mrs. Sherwood and the other to his son, he instructed his regular attorney to prepare the deeds, and executed them in the presence of the attorney and Mrs. Sherwood. None of the other instruments involved

was prepared by Lohman's regular attorney. Lohman did not instruct the scrivener of any of them to write the instruments. In each instance, Mrs. Sherwood communicated with the scrivener, gave him the description of the property and informed him of the kind. and nature of the instrument to be prepared. This was a marked departure from the usual manner in which Lohman had formerly conducted his business. The value of the gift made on December 27, 1938, was comparatively small. As the mental capacity of Lohman grew weaker, the value of the gifts became greater. At times in March, 1939, Lohman did not have sufficient mental capacity to transact any business. He responded to medical treatment and had lucid intervals, but his disease was incurable and he grew progressively worse until he was a pitiful mental wreck in October, 1939.

On this and other pertinent evidence the commissioner held that the execution of the deed on March 24, 1939, was the culmination of the expressed intention of the grantor made at the time the lots were purchased, and that this gift was valid. The commissioner further held that, prior to the time of the failure of Lohman's mental faculties, he had not only expressed an intention to build a home on these lots for Mrs. Sherwood but had bought much of the material and had supervised a part of the construction, and that Mrs. Sherwood had a right to use the money (about $9,000) expended in the erection of this building. The commissioner's final conclusion was that all instruments executed after July 1, 1939, were invalid. These findings of the commissioner are supported by substantial evidence and should have been affirmed.

For these reasons, the decree of the trial court is reversed, and the case is remanded with direction that a decree be entered in accordance with the views expressed herein.

*Reversed and remanded.*