# Richmond

SAMUEL KAPLAN, A PERSON NON COMPOS MENTIS, WHO
SUES BY HIS SISTER AND NEXT FRIEND, ESTHER
KAPLAN V. BESSIE KAPLAN COPELAND.

January 15, 1945.

Record No. 2871.

Present, All the Justices.

The opinion states the case.

*Amos Cameron Crounse* and *Russell T. Bradford*, for the appellant.

*James G. Martin & Son*, for the appellee.

EGGLESTON, J., delivered the opinion of the court.

In November and December, 1929, the New York Life Insurance Company issued to Samuel Kaplan, aged twenty-two, of Hampton, Virginia, two policies of insurance insuring his life in the sums of $5,000 and $3,000, respectively. Each policy provided for monthly payments to the insured, in the event of his total and permanent disability, with the added provision that should disability result from "insanity," payment would. be made to the "beneficiary in lieu of the Insured." At the time the two policies were written, the insured was the beneficiary thereunder, but on October 13, 1930, he executed and filed with the Insurance Company the required forms changing the beneficiary in both policies to his sister, Bessie R. Kaplan.

On February 27, 1931, upon the petition of Bessie R. Kaplan, a lunacy commission was held on Samuel Kaplan in the city of Newport News, where the parties then resided. Kaplan was adjudged insane and was ordered committed to the Eastern State Hospital at Williamsburg. On March 12, 1931, he entered the hospital where he remained until November 25, 1933. Except for the period from January 5, 1934, to June 6, 1935, when he was at a private sanatorium, Kaplan has lived either with his sister, Bessie (who in the meantime had married one P. Copland, sometimes spelled "Copeland"), or another sister, Mrs. Rosenberg. It is conceded that at the present time he is still mentally incompetent, and that Mrs. Copeland is his duly appointed and qualified committee.

Early in January, 1931, a claim for total and permanent disability on account of Kaplan's insanity was filed with the Insurance Company, which, according to the terms of the

policies, has regularly paid to Mrs. Copeland, the beneficiary, the sum of $80 per month.

Because of this disability Kaplan himself has received from other policies of insurance, in which he was the beneficiary, monthly payments of $60. These latter payments were made to Mrs. Copeland as his committee.

In January, 1941, Samuel Kaplan, suing as an incompetent person, through his sister and next friend, Esther Kaplan, with the approval of the court,[1] filed a bill in the court below against Bessie Kaplan Copeland, setting out the main facts hereinabove related, and alleging that the change in the beneficiary in the two policies was void because, it was said, Samuel Kaplan was mentally incompetent to have effected a valid change therein, and that it had been procured through the undue influence of Mrs. Copeland over her incompetent brother. The prayer of the bill was that the change of beneficiary be canceled and that Mrs. Copeland be required to account for and pay to the estate of Samuel Kaplan, the incompetent person, the disability benefits received by her from the Insurance Company under the two policies. Later two amended bills of complaint were filed, but for our purposes the supplemental allegations need not be detailed.

Mrs. Copeland answered the bills. While she admitted the issuance of the policies, the subsequent change of the beneficiary therein to herself, and the receipt by her of the disability benefits thereunder, she denied her brother's mental incompetency at the time the change in the beneficiary was made, or that such change was procured through her undue influence over him.

The evidence of the respective parties was taken by depositions, and the trial court concluded that it failed to show that Kaplan was mentally incompetent at the time the change in the beneficiary of the policies was made, or that such change had been procured through the undue influence

---

[1] For the propriety of the institution of the suit in this manner, where the interests of the committee and those of the incompetent are in conflict, see *Lake* v. *Hope*, 116 Va. 687, 707-9, 82 S. E. 738, and authorities there cited.

of Mrs. Copeland. Accordingly, it entered a final decree dismissing the bill, and from this decree the present appeal has been taken.

We agree with the conclusion of the trial court that there is no evidence that the change in beneficiary was brought about by any undue influence of Mrs. Copeland over her brother. There is no evidence whatsoever that she requested her brother to make the change in the policies. It is uncontradicted that she was not present at the time and did not know until some time afterwards that the change had been made. She and her brother had lived together for a number of years and were devoted to each other. Both of their parents were dead and the other brothers and sisters had established their homes elsewhere. If Kaplan desired and was competent to make a change in the beneficiary, it was but natural that he should have designated her as such.

This brings us to the single issue in the case. Was Kaplan mentally competent on October 13, 1930, to have effected a valid change in the beneficiary under the policies? The change, in effect, constituted a gift by him to his sister of valuable benefits which would accrue and be payable to him in the event of his permanent and total disability. In *Lohman* v. *Sherwood*, 181 Va. 594, 607, 26 S. E. (2d) 74, 80, we defined "the measure of one's capacity" to execute a deed of gift as being "sufficient mental capacity to understand the nature of the transaction he was entering into". The same applies here.

Whether Kaplan possessed, at the time in question, sufficient mental capacity to meet this test is a question of fact, and, as is usual in cases of this character, the evidence thereon is conflicting. Since the evidence before the trial court was in the form of depositions, and it did not see and hear the witnesses, its finding of fact, while "highly persuasive" and entitled to "great weight," is not binding on us. *McClintock* v. *Royall*, 173 Va. 408, 416, 4 S. E. (2d) 369, 372; *Barnard* v. *Barnard*, 132 Va. 155, 160, 111 S. E. 227.

Considering the evidence as a whole, as we should under

the circumstances indicated, we are of opinion that the preponderance is in favor of the contention of the appellant that Kaplan was mentally incompetent on October 13, 1930, to have effected a valid change in the beneficiary in the policies.

It will be observed that the evidence was taken more than ten years after the date in question, and hence, as might be expected, the verbal testimony of the various witnesses for either side is not entirely harmonious. However, such documentary evidence as exists clearly preponderates in favor of the contention of the appellant.

Samuel Kaplan seems to have quit school at the age of fourteen years to go to work. He was employed in various neighboring stores (including one operated by his brother, Frank), as a groceryman, down to August, 1930. He was discharged by a grocer in the summer of 1930 because "he was not mentally right," and his fellow-employees, as well as his employer, were "afraid of him." At that time, and even before, his conduct was queer. He talked foolishly, laughed aloud to himself, foolishly and without reason, and displayed other well-recognized symptoms of *dementia praecox.*

Kenneth Arch, a real estate agent and next-door neighbor, testified that five or six months after Samuel's father died, in October, 1929, Samuel appeared "worried" and began to talk foolishly, and that this condition progressed "until he got really bad." This witness was of opinion that Samuel was "losing his mind" and was not able to transact business.

Dr. Paul J. Parker, who was the Kaplan family physician, and had treated Samuel on many occasions, tells how in the summer of 1930 he was annoyed by Samuel's peculiar behavior in coming into the office and insisting that he be given the right of way over other patients. Dr. Parker was of opinion that, "at least a couple of years" before Samuel left Hampton, in 1930 or 1931, he had the "mind" "of a boy of twelve or fourteen years of age;" that he was "irresponsible," lacked interest in what he was doing, and seemed to be "going down the hill" mentally.

Dr. O. T. Amory saw Kaplan on November 28, December 11, and December 31, 1930. He thus recorded his symptoms: "The patient was extremely nervous, greatly excited, worried over himself, and being very fearful of losing his mind. One of his most outstanding symptoms was that he was running around laughing to himself all the time." He diagnosed Kaplan's trouble as *dementia praecox*, which, he said, was not an acute condition, but one of gradual development. He was of the further opinion that this condition had prevailed at least "a few weeks before I saw him," and that, in such a condition, he was not mentally capable of transacting business.

On December 31, 1930, Dr. Amory filled out the "Attending Physician's Report" to the New York Life Insurance Company, on which the disability payments were made. This report states that the insured was suffering from *dementia praecox* which began a "few weeks before November 24, 1930."

The necessary forms for filing proofs of claim of disability were furnished by the Insurance Company in the latter part of December, 1930, upon its receipt of a typewritten letter, dated December 22, 1930, and signed "Bessie R. Kaplan," in which it was said:

"Since about Aug. 3rd 1930 my brother Samuel Kaplan has been totally unfit to do any work. It would seem from the *diognosis* of our family physician that he is suffering from some mental derangement.

"My brother has *three* policies with the New York Life Insurance Co. of which I am named the *benificiary*.

"I *respectifully* request that you send me the necessary forms to make application for the necessary disability *benifits* contained in the policy contracts."

It is true that the appellee denied having written or signed the letter, but, in any event, the date of August 3, 1930, which the letter states was the commencement of her brother's mental disability, is the same date which the appellee gave on other occasions. It is the same date given in the

proof of claim executed by Kaplan himself, on December 31, 1930.

On January 6, 1931, the appellee took her brother to the Henry Phipps Psychiatric Clinic of the Johns Hopkins Hospital at Baltimore, where he was examined by Dr. Muncie. This physician was not available as a witness, but by stipulation of counsel his notes of examination were offered in evidence, and read as follows:

"According to the sister, Miss Bessie Kaplan with whom he lives, he lost his job five months ago because of his peculiar actions—simply staring at customers when they come in the store. About a month after coming home, he began to sleep most of the day but poorly at night. He then began to do queer things. He started for Old Point Comfort with not enough gas, which gave out after he had gone nine miles. He walked back home and left the car on the road. Then he turned against his sister in whom he previously had had all confidence. He would wake up in the night telling the colored maid to leave him alone, calling the police, thinking that people were walking about the house. There was no evidence of visual hallucinations. On one occasion he said to his sister, 'God put this on me, and it isn't meant for me.'

"According to his sister, the patient has been a hard worker. He left school at the age of fourteen when he was in the first year high. He quit in order to work, to make money. He has lost a great deal of money in the stock market, and the sister thinks this has worried him a great deal.

"The patient has few interests, and even those have dropped since the onset of the present illness.  * * *

"The patient himself is a large, florid man with sweaty hands, laughs incongruously, and holds the queer postures in which the examiner places his hands and legs. His talk is extremely vague, disconnected. He speaks of being nervous and upset. There is a great deal of incongruous laughter which he cannot explain. His sister states that he says people can read his mind, and that the 'colored maid at the house has had my head ever since I've been in this condition.'

He has felt influences working on him, such as electricity. He says the date is December 30 and does not know the day. * * * His memory seems to be intact. * * * General information is good. Judgment and insight are poor.

"Impression: Rather well-developed case of schizophrenia[2] with mixed paranoid and catatonic features. * * * "

From this record it clearly appears that Kaplan's disease originated even before he quit work, in August, 1930, and that it made definite progress within a month thereafter.

As has been stated, a commission of lunacy was held over the patient on February 27, 1931. The inquisition was attended by Dr. J. J. Cullinan, now deceased, Dr. C. B. Courtney, Frank Kaplan, likewise deceased, a brother of the patient, and Bessie R. Kaplan. The record of the inquisition states that the patient's attack of insanity first occurred on August 3, 1930, and describes the symptoms as follows: "Delusions; mannerisms; talks at random; laughs without provocation; * * * very talkative;" etc.

Dr. Courtney testified in the present proceeding that the history of the patient's case, as recorded at the inquisition, was taken from information furnished mostly by his sister, Mrs. Copeland.

Dr. Courtney also testified that *dementia praecox* is "as a rule a progressive disease;" that from the information furnished at the inquisition, he was of opinion that Samuel Kaplan was "mentally unbalanced in August, 1930;" and that he was incapable "of understanding business transactions" and incapable "of making a contract" between August 3, 1930, and the date of the inquisition on February 27, 1931.

Mrs. Copeland, the appellee, testified that she first detected that her brother was suffering from mental trouble after their trip to the Johns Hopkins Hospital, and that prior to that time she had never suspected "that there was anything the matter with him mentally." But both the verbal and documentary evidence, as well as her own conduct, show that she is mistaken as to this. Dr. Amory testified that the

---

[2] A type of *insanity* which "includes *dementia praecox.*" Webster's New International Dictionary.

appellee visited his office with her brother in November and December, 1930, when the brother's trouble was diagnosed as *dementia praecox*, and she was advised to consult a psychiatrist. Her visit to ·Dr. Muncie at Baltimore followed shortly thereafter. One does not take a relative to a re-nowned psychiatric clinic for examination unless or until she is disturbed as to the relative's mental condition. We think, the documentary evidence which we have detailed conclusively shows that the appellee stated both to Dr. Muncie and to the lunacy commission, if not to the Insurance Company, that her brother's mental trouble began as far back as August 3, 1930.

Much emphasis is laid on the fact that W. E. Smyre, the agent for the Insurance Company, who wrote the policies and assisted in the change of the beneficiary, testified that he "didn't notice any difference at that particular time" in Kaplan's mentality. However, Smyre did recall that Kaplan complained of feeling badly and spoke of taking a vacation. When asked the direct question as to whether Kaplan seemed "to be perfectly rational at that time," his answer was: "Well, I don't know. I saw him fill out the papers and there was nothing that appeared to me out of order, and that is all I know about it. Nothing at all appeared out of order. I didn't spend very much time with him. I remember taking them back to him and handing them ·to him and he thanked me and said he was glad he had done it. It is just such a routine matter with me, you know. I have hundreds of cases like that."

To say the least, this testimony is not convincing on the issue involved. Moreover, when analyzed, Smyre's transaction with Kaplan amounted to this: In response to a telephone conversation, Smyre called on Kaplan who told him that he desired to change the beneficiary in two of his policies to his sister. After filling out on the typewriter the two brief and simple forms to be attached to the respective policies, Smyre took them to Kaplan who merely signed his name to each. There is no testimony that the effect of the change was discussed, or that Kaplan understood that as a

result of it, in case of permanent and total disability, the benefits under the policies would go to his sister and not to himself.

Hyman Brenner, who operated a bakery in the vicinity, testified that Kaplan ran a delivery truck for him three or four weeks in October, 1930, was a good worker, kept his records and money straight, and appeared to be all right mentally. But after a lapse of more than ten years this witness was manifestly confused as to the date, because the testimony of all of the other witnesses, including that of the appellee herself, is that Kaplan stopped work in August, 1930. He must have been employed by Brenner at some previous time.

One of the principal witnesses for the appellee was Gerson Held of Baltimore, a friend of the family whom Kaplan visited in the latter part of August and the first part of September, 1930, in search of employment. To this witness Kaplan appeared "perfectly normal" except for being depressed because of his inability to find work.

There is other evidence from lay witnesses which in a general way supports the position of the appellee that Kaplan was mentally competent on October 13, 1930. But, as we have said, the preponderance of the evidence, particularly the documentary evidence and the testimony of the family physician and other medical experts, is the other way. Indeed, all of the medical testimony, which in cases of this character is necessarily entitled to greater weight than that of lay witnesses (*Price* v. *Barham*, 147 Va. 478, 481, 482, 137 S. E. 511), supports the contention of the appellant.

On the whole, we are of opinion that under the evidence submitted Kaplan did not have sufficient mental capacity, on October 13, 1930, to understand the nature of the transaction whereby he stripped himself of and gave to his sister the valuable disability benefits which might thereafter accrue, and did accrue, to him under these policies of insurance. Therefore, the trial court erred in not decreeing that such change of beneficiary in the policies was invalid and should be canceled.

The decree appealed from is reversed and the cause is remanded for further proceedings in conformity with the views here expressed.

*Reversed and remanded.*