## WILLIAM A. WOLFORD AND ROBERT C. ORNDOFF V. FRANK R. WILLIAMS, AND ANOTHER.

November 30, 1953.

Record No. 4089.

Present, All the Justices.

The opinion states the case.

*J. Sloan Kuykendall* and *Henry H. Whiting*, for the appellants.

*Harrison, Benham & Thoma, Walter H. Carter* and *J. F. Larrick*, for the appellees.

SMITH, J., delivered the opinion of the court.

William A. Wolford and Robert C. Orndoff instituted this suit in September 1949, to enforce the claim of each for salary due from and money advanced to Frank R. Williams in his lumber business, and to set aside a deed from Frank R. Williams to Robert C. Williams, his son, which conveyed a tract of timber land containing about 7,300 acres in Frederick county, on the ground that it was a voluntary conveyance.

Frank R. Williams answered admitting that the conveyance mentioned was voluntary except to the extent of $5,000, but denied that he owed either Wolford or Orndoff any amount. Robert C. Williams, the grantee in the challenged deed, likewise answered claiming payment of $5,000 to his father for the land.

Prior to April 1946, the large tract of timber involved, known as "The Big Survey", was owned by Robert C. Williams and others who had been conducting thereon a lumber operation. At that time the business was un-

profitable and Frank R. Williams, a resident of Amherst, Virginia, and 79 years of age, acquired the business and the land.

Wolford, foreman for the former business, was continued in that position, and for his general manager, Williams employed Orndoff, an experienced lumberman.

The elder Williams contends, and in his answer asserted, that he is not indebted to appellants because he sold the business to Orndoff under a contract by whose terms all of his debts to Orndoff were cancelled and Orndoff agreed to pay all debts of the business then outstanding. The alleged contract of sale reads as follows:

"April 12 '47

"For value Received I . Frank R. Williams owner of "Frank R. Williams" Lumber Dealer located at Gore, Va do here by sell all of My Interest in said Firm To Robert C. Orndoff of Waynesburg Pa. Who hereby agrees to pay all the debts owed by Me to any one entitled to same.

"He to collect all accounts due Me. and carry on the business as he sees fit.

F. R. Williams<br>
Robt. C. Orndoff"

The paper was prepared by Williams and copied by Orndoff, both signing each copy and each retaining the copy the other had written. In the trial court there was conflict as to the date the writing was signed, but all parties now agree that it was signed in March 1948 and antedated to April 12, 1947.

Although Orndoff filed an amended bill subsequent to Williams' answer, nowhere in his pleadings was the writing mentioned; however, in his testimony he did deny that he purchased the business or that he agreed to pay any of Williams' debts and claimed that neither party to the writing intended a sale, but that Williams asked him to sign the paper as an accommodation and to prevent Williams'

personal property from being included as security for a contemplated loan.

The evidence was taken by depositions and the trial court in a written opinion held that: (1) the conveyance from Williams to his son was without valuable consideration and was therefore voidable as to existing creditors, (2) the signed paper was a valid and enforceable contract and constituted a sale to Orndoff of the lumber business operated under the name of Frank R. Williams together with all the property and assets of the business and settled all claims by Orndoff against Williams, (3) Wolford was entitled to recover of Williams the sum of $2,058.52 (which on petition for rehearing was increased to $2,559.78) with interest thereon from the date of judgment, (4) under the terms of the sale Orndoff assumed all of the debts of the business including Wolford's claims against Williams and if Williams were required to pay Wolford's claims he should have recourse against Orndoff. By its decree dated June 28, 1952, the court put into effect these holdings but refused to award Williams judgment against Orndoff for such sums as he might be required to pay to Wolford. To which decree errors and cross errors were assigned, and an appeal was awarded appellants.

The first question presented by the assignments of error and the most vital issue in the case is whether the paper dated April 12, 1947, is a valid, binding contract. If it is, Williams owes Orndoff nothing and Orndoff is responsible for the debts of the business.

On December 27, 1949, when Williams' answer was filed, this issue was raised in language clear and direct, " * * * that the said business was on that date, and as of the 12th day of April, 1947, sold and assigned to the said Robert C. Orndoff, and that the business was carried on by the said Robert C. Orndoff after the said —— day of May, 1947, as his own." And the indebtedness for salaries and advances was alleged to have been duly settled and satisfied by the said agreement entered into between the parties. This con-

tention was reiterated in this language: "Your respondent does again allege that all liabilities to the said Robert C. Orndoff for the operation of said business in Frederick County were settled and satisfied by the said agreement of May, 1947, and that your respondent did not operate the said business after that date, and that said Robert C. Orndoff did agree to pay for your respondent any and all unpaid accounts existing prior to May, 1947."

Orndoff was aware of Williams' intention to rely on the writing purporting to discharge his debt and obligate Orndoff to pay the outstanding debts of the business, not only because of Williams' answer filed in the case but because Wolford had informed him prior to suit that Williams contended that he had sold him the business and that Orndoff owed its obligations. It was, therefore, incumbent on Orndoff to explain promptly, frankly, and straightforwardly why the writing did not mean what it stated. This he did not do.

In his direct testimony Orndoff ignored the contract, and only when pressed on cross examination did he set up his explanation of its meaning. In order to understand his contention, it is necessary to quote at length from his testimony.

"Q. Actually, Mr. Orndoff, didn't you write, yourself, in your own handwriting and sign an agreement which was dated back to the date given on this note, by which you purchased from Mr. Williams this business, which included the tangible personal property, the right to saw on the set that your saw was in at that time and the logs and accounts receivable, in which agreement you promised to pay all the debts then existing in the business?

"A. There is a lot between this and where you are starting that. I will say no to that as it is, because there is a lot of—

"Mr. Whiting [Orndoff's counsel]: All right, just answer the question.

"The Witness: I will say no there."

Upon being confronted with the agreement he acknowledged his signature and after stating where and when he had signed it he said: "And not willfully did I sign it, but by two to three hours discussion."

When he was asked if by the contract he agreed to pay Williams' debts this discussion ensued:

"A.   He agreed to pay me, too, but he didn't.

"Q.   You agreed to pay those, did you not?

"A.   You read it, didn't you?

"Q.   I am asking you.

"A.   I said I had paid part of those debts, what I positively had to pay.   I didn't know that I had to pay any of them, but I did.   Those debts didn't belong to me, as was stated to me, at all.   It was absolutely misstated to me, positively, 100 per cent."

With reference to taxes Orndoff testified:

"Q.   You paid the taxes, did you?

"A.   I did not, I paid part of them.

"Q.   Paid part of the taxes?

"A.   I did, because I thought that they were going to go ahead, and there was to be no change whatsoever in the business."

Further, with reference to the signing of the contract, he said:

"Q.   And did your sickness have anything to do with your signing it?

"A.   I said it didn't.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"Q.   Why did you sign it, then?

"A.   I said I just didn't know any better, I was just ignorant to the fact.   You don't think that I was dumb enough, do you?   I am dumb, I know."

After extended questioning in search for an explanation of why the witness signed the agreement he was asked:

"Q. Tell me, Mr. Orndoff, why did you sign this?

"A. I am going to tell the whole tale, I am going to tell it just exactly as it happened. He called and wanted us to come to the Afton Inn, meet them there and have dinner with them at 12 o'clock. We didn't get started until late, because it was snowing bad, and we wasn't figuring on going, and we was trying to call through. And we got through to them and told them we wasn't coming on account of snow and slush. And he said it was nice and clear down there and they were ready to start, and then we got ready to leave Gore and went down there. We didn't get down there until one o'clock.

"Q. Just answer the question why you signed it, not how you got there, and where you travelled and what kind of car you went in, but why did you sign this?

"A. All right, I am going to explain the thing regardless. Mr. Williams laid the law down to me, as he had before, and I can prove what I am telling you, that some men had his hands tied, that he had to give a mortgage on this place or collateral, because Mr. Burdick, he said, of the bank at Cleveland had died, and he said he couldn't do a thing with this new man that was in there. And he said he was asking for a bigger loan on this place than he had on it, and he was going to have to give a mortgage on this real estate and the personal property likewise to cover it. And he pleaded with me between two and three hours, if I wouldn't sign that contract, and as ignorant as I am—and believe me, I am —he wanted me to sign this contract to show this man when he came down. He said it would be just a short spell, to show this man that the personal property belonged to me so that he wouldn't ask for this in, to be included in the loan.

"Now, that's as true as there is a God, and let God speak his word, and I will tell you that I am telling the truth."

In May of 1948 Wolford went to Williams' home in Amherst and requested payment on his account and at that time Williams showed him the contract and indicated that

he intended to use it against Orndoff, which statement Wolford communicated to Orndoff soon thereafter. Orndoff was then asked:

"Q. Why was it after you found out that Mr. Williams was going to use this contract against you you didn't remonstrate with him as soon as you could? Why did you wait all that time?

"A. Well, I didn't even think of the contract as a contract. That was just as sort of an accessory of his.

"Q. But Mr. Wolford told you the attitude Mr. Williams was taking. Why didn't you then do something after you had gotten out of the hospital, not while you were sick, but later why didn't you?

"A. I don't know, I didn't think much about it. I didn't think too much about it. I didn't think anything like this was coming up at all, never dreamt of such a thing.

"Q. If Mr. Williams should tell Mr. Wolford that his hands were tied because of the contract, why wouldn't it bring it to your attention?

"A. He told me that he was going through with a deal that might change the whole situation.

"Q. I am not talking about Mr. Williams, I am talking about Mr. Wolford telling you after Mr. Wolford's trip down there in May when Mr. Williams showed him the contract and said his hands were tied, that he couldn't pay any of his debts.

"A. This was just to be good for 30 days only. That was just temporary. He said this would just be good for 30 days only, and I didn't think of it as a contract or agreement, I just simply ignored that as practically nothing, for that is what he pledged with me to be.

"Q. He said it would only be good for 30 days?

"A. Something like that. 'Sure, he did so. He told me then that his hands were tied.

"Q. What did he say he was going to do, buy it back afterwards, or tear it up afterwards?

"A.   I guess.

"Q.   What did he say?

"A.   That's the question.

"Q.   What did he tell you at the end of the 30 days was to happen?

"A.   Well, he said we'd go ahead and make some other arrangements of some kind, but he told me that this would just be good for approximately 30 days, when they got this proposition straightened out about his hands being tied.

\*          \*          \*          \*          \*          \*          \*

"Q.   What sort of a new arrangement was to take place after the 30 days?   What sort of a new contract?

"A.   We had no new contract.   There was no meaning to this contract, as I understood, of any kind.

"Q.   Was the contract just to last for 30 days?

"A.   Does it say on that that it is?

"Q.   No.   You said 30 days.

"A.   Well, he said about 30 days.

"Q.   It was to be a contract of sale for 30 days, is that it?

"A.   Contract of sale, something like that.   He said about 30 days."

In addition to his own testimony Orndoff relies on the acts and statements of Williams subsequent to the execution of the contract to prove his case.   He points out that the business was continued in Williams' name; the titles to trucks were not transferred; the style of the bank account was not changed; Williams requested an audit of the business and in a letter to a prospective purchaser offered to sell the "complete outfit."   In explanation of this evidence, Williams replies that he continued to be interested in the business, notwithstanding the fact that Orndoff had assumed the debts, because he remained liable for the obligations created while he owned the business.

Next it is contended that "The obvious unfairness and inadequacy of the contract is itself convincing evidence of

the fraud Williams is attempting to perpetrate on Orndoff." Assuming the accuracy of appellants' statement that the assets amounted to approximately $9,000 while the debts owed appellants alone totaled approximately $10,755, this does not show that there was no sale. Even though the contract may have been unwise it is not sufficient to shock one's conscience. *Planters Nat. Bank* v. *E. G. Heflin Co.*, 166 Va. 166, 184 S. E. 216.

Although some of Williams' acts and statements after the execution of the contract do lend countenance to the claim that a sale of the business was not intended, Orndoff has not complied with the firmly established rule that fraud, when relied upon must be alleged and proved by evidence that is clear, cogent and convincing. *e.g.*, *McClintock* v. *Royall*, 173 Va. 408, 4 S. E. (2d) 369; *Ashby* v. *Red Jacket Coal Corp.*, 185 Va. 202, 38 S. E. (2d) 436.

In his pleadings Orndoff makes no allegation of fraud but in his testimony he charges Williams with deception and imposition. Yet his own explanations of the exact contractual relationship between them are more contradictory and inconsistent than those advanced by Williams, leaving the mind doubtful and suspicious as to the true state of facts. Moreover, when first confronted with the contract, Orndoff denied that he signed it, but then admitted that he had done so reluctantly, and "not willfully" but that he was deceived and taken advantage of because of his ignorance. Upon being pressed, he promised to "explain regardless" and tell "the whole tale" which turned out to be a plan to enable Williams to impose on a creditor. Then at the conclusion of the case he restated in detail an earlier contention that the contract was to continue for a 30 day period.

The trial court on conflicting evidence found that Orndoff had failed to sustain the burden of proving that the contract dated April 12, 1947, was invalid. While a decree based upon evidence taken by depositions is not entitled to the same weight as one based upon evidence heard *ore tenus*, it is, however, "highly persuasive", "presumptively correct"

and entitled to "great weight" in this court. *Kaplan* v. *Copeland*, 183 Va. 589, 32 S. E. (2d) 678; *Porter* v. *Frost*, 183 Va. 549, 32 S. E. (2d) 687; *McClintock* v. *Royall*, 173 Va. 408, 4 S. E. (2d) 369. See also, 1 M. J., Appeal and Error, § 279, page 710. We have examined the evidence and the exhibits with care and are satisfied that this conclusion, entitled as it is to great weight, is correct.

Our view of the contract disposes of Wolford's contention that judgment should be awarded him against Williams for his claims arising after he received notice of the contract, and brings us to his assignment of error that the trial court should have allowed interest on his claims from the alleged due date of each claim instead of merely from the date of the judgment.

The allowance of interest is in the sound discretion of the trial court. Code, § 8-223; *Beale* v. *Moore*, 183 Va. 519, 32 S. E. (2d) 696; 10 M. J., Interest, § 4, page 586. In this case there were claims, counter claims, and questions of both primary and secondary liability for the trial court's determination. Under all the circumstances we are of the opinion that Wolford's claims remained unliquidated in nature and disputed in amount until the actual date of judgment. The trail court, therefore, did not abuse its discretion in awarding interest only from the date of its judgment.

The remaining question for our consideration developed after the holding of the court that, "Claims arising after notice of the contract [to Wolford] would be solely against Orndoff. Those arising prior to notice would be against Williams with Orndoff only secondarily responsible therefor, there being no evidence that Wolford ever accepted Orndoff as solely responsible. Of course, if Williams were required to pay Wolford's claims he should have recourse against Orndoff on the contract." Appellees first moved the court to include in its decree this provision: "The complainant, Robert C. Orndoff, is primarily liable to pay said obligation of Frank R. Williams, and that, therefore,

upon the payment of said sum by the defendant, Frank R. Williams, to William A. Wolford, the said Frank R. Williams is entitled to recover of the said Robert C. Orndoff the amount paid by Frank R. Williams to William A. Wolford." The court, however, refused because the "pleadings contained no prayer for the same." Appellees then moved for permission to amend the pleadings to include such prayer, which motion the court ruled came too late.

The answer alleges that, "* * * even if it be found that William Wolford is entitled to receive any sums for services rendered during the said period (March 1, 1946 to May ——, 1947), your respondent alleges that the said Robert C. Orndoff agreed to pay the same; * * * " and further that, "WHEREFORE your respondent prays * * * that thereafter this case may be dismissed from the docket and your respondent released from the claims of complainants, with his reasonable costs by him in his behalf expended." Technically this language does not amount to a cross bill or prayer for a judgment against Orndoff for amounts that might be due Wolford. While this question was not properly raised by an appropriate pleading, yet the issue of whether Orndoff was liable for all debts of the business was fully litigated and properly adjudicated. This litigation has been pending for more than four years and should be terminated as speedily as possible without added costs incident to a new proceeding.

A court of equity regards substance rather than mere form and having all the parties before it, may very properly mold the pleadings so as to ascertain the rights of the parties and thus end the litigation by securing and enforcing those rights by proper decrees. *Adkins* v. *Edwards*, 83 Va. 300, 2 S. E. 435; Lile's Equity Pleading and Practice § 156 (Meade, 3rd ed. 1952). Therefore in accordance with Code, § 8-119 and Rule 2:12 that, "Leave to amend shall be liberally granted in furtherance of the ends of justice", the case will be remanded with directions to the trial court to

permit an amendment and to enter such decree as is proper thereon.

The decree appealed from is affirmed, except to the extent that it denies the appellees permission to amend their pleadings. For the purpose of permitting such amendment the judgment is reversed and the cause is remanded with directions to the trial court to allow an amendment and to enter an appropriate decree. The appellees having substantially prevailed, shall recover their costs.

*Affirmed in part; reversed in part and remanded.*