# Richmond

## Safway Steel Scaffolds of Virginia, Incorporated v. Norman A. Coulter.

October 8, 1956.

Record No. 4567.

Present, Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Beecher E. Stallard,* for the appellant.

*Jack B. Coulter* (*E. Griffith Dodson, Jr., J. Maurice Miller* and *Dodson, Pence and Coulter,* on brief), for the appellee.

SMITH, J., delivered the opinion of the court.

On July 25, 1952, Norman A. Coulter, plaintiff, instituted this suit in equity against Safway Steel Scaffolds of Virginia, Incorporated, defendant, seeking an accounting and discovery under a contract of employment entered into between the parties.

The cause was referred to a commissioner in chancery, Sam B. Witt, Jr., with directions to make certain inquiries and report his findings to the court. In February of 1954, the commissioner reported that plaintiff was entitled to recover from defendant the sum of $7,522.17, with interest from June 10, 1952, and that costs of the proceeding should be paid by defendant.

Both parties excepted to this report and after a hearing the trial court on February 4, 1955, recommitted the cause to the same commissioner with directions to revise the account in certain enumerated particulars. After receiving the commissioners revised report, the court overruled all exceptions filed by both parties and entered a final decree on October 5, 1955, in which it held that plaintiff was entitled to recover from defendant the sum of $7,005.21, with interest at 6% from February 4, 1955, until paid, and assessed two thirds of the costs against defendant and one third against plaintiff. To review that decree we granted defendant this appeal.

The defendant is a Virginia corporation engaged throughout Virginia in the sale and rental of steel scaffolding and allied equipment used in construction work. The bulk of its business is in renting its equipment for fixed periods of time, as by the day, week, month

or job. In the course of its business defendant negotiates with contractors or builders who require or might need some of its material. The customer enters an order for certain equipment to be sent to a designated job at a stated time, to be rented for a definite period at an agreed rental. When the material is delivered an invoice covering the rental period is sent to the customer, who is not obligated to pay rental for the equipment beyond the period stated in the invoice, even though he may have estimated in his order that he would need a greater amount of material for a longer period of time. If in fact he desires to use the material for an additional period he is sent another invoice covering the additional period.

In June of 1950, defendant established an unincorporated branch of its business in the western part of the state known as Safway Steel Scaffolds of Roanoke. In September of that year, defendant advertised in the Roanoke papers for a "branch manager and salesman— to take charge of a nationally advertised steel scaffolding warehouse," and indicated that "very attractive arrangements" could be made. This advertisement led to a conference in Richmond on September 18, 1950, between Cary A. Nicholas, defendant's president, and plaintiff, a resident of Roanoke. As a result of this conference the parties entered into an oral agreement under which plaintiff became manager, sales and rental representative of defendant's Roanoke branch, under a profit sharing arrangement which will be described later in detail. His territory consisted of 54 counties located generally in the western part of the state with offices and warehouse in Roanoke.

Plaintiff worked under the oral agreement until March 4, 1951, when its terms and conditions were reduced to writing. The written agreement recites that it was made "this 18th day of September, 1950, to be effective as of the 1st day of September, 1950," and that the "term of this agreement shall be one year from September 1, 1950, through August 31, 1951." Shortly before the agreement expired on August 31, 1951, it was renewed for one year with an amendment that either party might terminate the contract upon 30 days written notice to the other party.

Defendant kept all the books and handled the invoicing for both the Roanoke branch and the Richmond office. The parties disagreed as to the proper accounting for the first year of the agreement, and upon 30 days notice the contract was terminated by defendant on May 10, 1952. A further disagreement arose as to the proper ac-

counting for the period between August 31, 1951 and May 10, 1952, and thereafter this suit was instituted to obtain a correct accounting for the entire period of the plaintiff's employment.

There are 15 assignments of error and five cross errors filed in the case, but the parties agree that the main issue presented for our decision is whether certain business represented by invoices to customers located in the territory assigned to plaintiff should be included in the gross profits of the Roanoke branch in computing plaintiff's compensation under the contract. This issue requires our determination as to which, if any, of the following amounts must be included in computing gross profits of the Roanoke branch: (1) $17,027.52, based on invoices dated between September 1, 1950 (date the contract by its terms became effective) and May 10, 1952 (date the contract was terminated); (2) $16,216.52, based on invoices dated between September 18, 1950 (date the oral contract was actually entered into) and May 10, 1952; and (3) $5,156.16, based on invoices dated subsequent to the termination of plaintiff's employment. The amounts shown under (1) and (2) represent business invoiced in plaintiff's territory as a result of inquiries or orders filed with defendant prior to plaintiff's contract of employment, and the amount shown under (3) represents inquiries or orders filed with plaintiff prior to the termination of his employment, but not invoiced until thereafter.

Defendant contends that none of the amounts enumerated should be included in the gross profits of the Roanoke branch, while plaintiff contends that both (1) and (3) should be included. In his report the commissioner included in gross profits the amount shown under (2), but the trial court in arriving at its decree included in gross profits only the amount shown under (1). On this phase of the case we agree with the holding of the trial court.

The contract is basically a profit sharing agreement and spells out the formula for determining plaintiff's compensation, which is provided for under section D of the contract as follows: "The Company shall pay to Norman A. Coulter the following compensation: 1. A drawing account of $75.00 per week for the first six months to be increased as of March 18, 1951, to $100.00 per week (less required deduction for social security and withholding tax). The drawing account is to be deducted from the one-third yearly net profits hereinafter set forth. 2. As additional compensation, one-third of the yearly net profits of Safway Steel Scaffolds of Roanoke." It is then provided that the net profits of the Roanoke branch shall be deter-

mined by deducting its yearly operating expenses from its yearly gross profits. What is intended by the use of the terms gross and net profits and operating expenses is defined in each instance. Therefore, to arrive at a correct accounting between the parties it is necessary to determine the accounting period, and the amounts or amount to be included in the gross profits of the Roanoke branch, as provided in the contract.

As to the accounting period, it is true, as defendant points out, that plaintiff did not commence his employment until September 18, 1950, and that there is evidence to the effect that the contract was made retroactive to September 1, 1950, solely to coincide with defendant's fiscal year. But these reasons do not warrant the computation of gross profits from September 18, 1950, because the parties expressly agreed in the contract that it was "to be effective as of the day of September, 1950," and the evidence shows that plaintiff was charged with the expenses of the Roanoke branch from that date. Consequently, we hold that the accounting under the contract includes the period between September 1, 1950 and May 10, 1952, the date the contract was terminated.

Since the amounts of business in dispute were admittedly done with customers located within the territory assigned to plaintiff, the next question is whether that business was done, for purposes of determining gross profits under the contract, when the material and equipment was delivered and invoiced or when the orders therefor were received. We hold that the date of invoicing is controlling.

Under sections A and B of the contract plaintiff was employed by defendant as "general manager of its western division" and charged with the "sale and rental" of its "material and equipment" on an "exclusive basis" in an expressly described territory. Then in section C, entitled "Exclusive Arrangement," the parties agreed that: (1) *"all inquiries* made to The Company from firms or individuals located in the hereinabove defined territory of Safway Steel Scaffolds of Roanoke *shall be immediately referred* to Norman A. Coulter;" (2) *"all orders* from firms or individuals located in the terrritory of Safway Steel Scaffolds of Roanoke *that are placed* with Safway Steel Scaffolds of Virginia *shall be invoiced* by Safway Steel Scaffolds of Roanoke and credited to it;" (3) *"all material and equipment sold or rented* to firms or individuals located in the territory of Safway Steel Scaffolds of Roanoke *shall be invoiced by and credited*

*to Safway Steel Scaffolds of Roanoke regardless of where the material or equipment may be used."* (Italics supplied).

Provisions (2) and (3) of the "Exclusive Arrangement" are the source of most of the controversy on the issue of whether the amounts shown on the invoices rendered during plaintiff's employment, as a result of orders received by defendant prior to the effective date of the contract, shall be included in the gross profits of the Roanoke branch. It will be observed that under these provisions "all orders" and "all material and equipment sold or rented" shall be "invoiced" and "credited" to the Roanoke branch. When these provisions are read along with section E,[1] where the parties agree that "gross profits shall be determined from the invoices," it is clear that gross profits include only the amounts shown on the invoices for "all orders" received from, and "all material and equipment sold or rented" to, customers located in plaintiff's territory during the effective period of the contract. It follows, therefore, that none of the amounts shown on any of the orders received from customers located in plaintiff's territory was intended to be included in gross profits or "credited" to plaintiff until "invoiced."

The same reasoning leads to the conclusion that plaintiff should receive credit for all business *invoiced* during his employment to customers *located* in his exclusive territory, regardless of whether that business was secured by him or someone else. This was, in fact, the primary purpose for including these disputed provisions in the contract. The only time defendant was permitted to do business in plaintiff's territory without giving him credit for it was provided for in section C as follows: (1) "Material or equipment that is sold or rented to firms or individuals not located in the territory of Safway Steel Scaffolds of Roanoke but used in said territory shall not be invoiced by or credited to Safway Steel Scaffolds of Roanoke;" and (2) the defendant "reserves the right to solicit business in the territory of Safway Steel Scaffolds of Roanoke, if and when, in The Company's opinion and after notice to Norman A. Coulter, the said territory is not being adequately covered."

No controversy is presented as to the defendant's exercise of either of these reserved rights, but the fact that they were actually inserted in the contract is of particular significance when it is observed that

---

[1] Section E of the contract provides:

"That Company shall keep separate books of account for Safway Steel Scaffolds of Roanoke, and the total gross profits of Safway Steel Scaffolds of Roanoke shall be determined by the invoices rendered by Safway Steel Scaffolds of Roanoke. * * *"

no specific reservation was made of orders already in defendant's hands when the contract was executed, to be filled and invoiced in some instances over a considerable period. Likewise, no express provision was made for inquiries or orders received by plaintiff but not filled or invoiced until after the termination of his employment. In addition, nowhere in the contract is there any exception or reservation as to any orders received from firms or individuals located in the territory assigned to plaintiff. Therefore, the absence from the contract of such a provision is of especial importance since it appears from the evidence that the orders received by defendant prior to September 1, 1950, but not filled and invoiced until thereafter, were discussed by the parties at the time the contract was agreed upon.

Furthermore, it may be reasonably inferred from the circumstances under which the contract was made that it was intended as a part of the inducement to allow plaintiff to receive credit for the material and equipment invoiced during the period of his employment even though the orders therefor had already been received. The record discloses that at the time the contract was entered into defendant had already had unsatisfactory experiences with two managers in a three month period; shortages of material and equipment were in acute prospect due to the fighting in Korea, and a seasonal drop in construction work was anticipated. In response to defendant's offer of "very attractive arrangements" plaintiff was immediately hired and entrusted with an inventory of material and equipment valued at more than $40,000. He had been in the construction industry since 1919 and had managed construction equipment companies which had annual sales of over a million dollars with sales organizations alone of as many as 15 salesmen. Yet, under the contract he was to receive only one third of the net profits of the Roanoke branch after deducting therefrom his "drawing account" of $75 per week for the first six months and $100 per week thereafter.

In addition, the contract not only provides that gross profits shall be determined from the invoices but it appears from the evidence that in the course of defendant's business the invoices constituted a much more accurate record of accrued business than the orders received from its customers. Defendant considered the orders of its customers more in the nature of prospective or potential business than as a binding obligation, because the estimates of amounts and the time material would be needed were generally uncertain and always subject to change and cancellation. But when the material was delivered it

was invoiced for an agreed price and period and the customer was then obligated to pay only for the period represented by the invoice, even though he had estimated in his order that he would need a greater amount of material for a longer period of time.

In the light of the foregoing, we hold that the gross profits of the Roanoke branch include all business invoiced during the effective period of the contract in the territory assigned to plaintiff, regardless of when the orders or inquiries therefore were received. It follows therefore that the trial court did not err in including in the gross profits of the Roanoke branch only the sum of $17,027.52, the total amount represented by invoices rendered between September 1, 1950 and May 10, 1952.

The only additional questions that merit discussion are as follows: (1) whether the following alleged items of expense of the Roanoke branch should be included in its operating expenses— (a) freight and express charges on material and equipment shipped to the Roanoke branch and sold or rented by both it and defendant, (b) licenses, insurance and depreciation incident to the operation of an automobile used by plaintiff in the business of the Roanoke branch, and (c) federal and state income taxes; (2) whether interest on the amount found to be due plaintiff should run from June 10, 1952, the date found by the commissioner to be a reasonable time for defendant to have submitted its accounting, or from February 4, 1955, date the trial court expressed in an opinion-letter its conclusions on the merits of the case; and (3) whether costs in the trial court should be shared by plaintiff.

We shall determine these questions in the order stated.

Section D(c) of the contract provides that "operating expenses" of the Roanoke branch shall include:

"(1) Federal, State, and local taxes.

"(2) The traveling and automobile expenses of Norman A. Coulter.

"(3) The wages paid to any other employee of Safway Steel Scaffolds of Roanoke.

"(4) All other expenses directly attributable to the business of Safway Steel Scaffolds of Roanoke, including office and warehouse rent, proportionate part of the salary of the bookkeeper for Safway Steel Scaffolds of Virginia for keeping books of Safway Steel Scaffolds of Roanoke, office and warehouse supplies, printing costs, telephone, telegram, lights, heat, water, the operating expense of the Dodge truck, including its depreciation, depreciation of office furniture, and commissions paid to sub-dealers on rentals and sales."

We agree with the commissioner and the trial court that the freight and express charges incurred in the purchase of material and equipment delivered to the Roanoke branch should not be treated as a cost of acquiring stock in trade but as a cost of acquiring a fixed asset, and therefore not a part of the operating expenses of the Roanoke branch. While in a technical sense the freight and express charges on material sold would be an operating expense, the evidence shows that this material and equipment was not only sold and rented by both the Roanoke branch and defendant, but that over 80% of the corporation's business consisted of renting. Furthermore, in the course of defendant's business the amount of freight or express allocable to material and equipment sold was charged to its cost before determining profit; and this material and equipment was treated by defendant in its income tax returns as fixed assets rather than stock in trade.

The commissioner also included in operating expenses two thirds of the amounts claimed by plaintiff for state and city licenses, insurance and depreciation on a 1950 model automobile used by him in traveling over 20,000 miles per year in the course of his employment, one third of his claim being disallowed because of personal use. The trial court approved the commissioner's report except as to the amount allowed for depreciation, for which no allowance was made.

The evidence shows that under generally accepted accounting principles these items should be included in the provision "traveling and automobile expenses." It is true that under section D(c)(4), *supra*, of the contract the parties expressly included in operating expenses depreciation on a truck owned by defendant and used by the plaintiff in the business of the Roanoke branch, but this provision was made because the truck was a 1941 model and had been fully depreciated at the time of the contract. It also appears that title to the automobile was in the name of plaintiff's wife. However, the use of an automobile was essential to the business of the Roanoke branch and this automobile was actually used in that business to the benefit of defendant. Consequently, we hold that all of the amounts recommended by the commissioner as "traveling and operating expenses" should be included in the "operating expenses" of the Roanoke branch. The commissioner allowed $557.58 for automobile depreciation. When this amount is deducted as an operating expense from total gross profits plaintiff's one third share of net profits is reduced by the sum of $185.86, but since he is entitled to receive

payment for the depreciation the total amount of his award must be increased by the sum of $371.72.

The commissioner construed the language, "Federal, State, and local taxes," as referring "only to such Federal, State and local taxes as were actually assessed against the Roanoke Branch and paid for or in its behalf," and therefore made no allowance for any income taxes. The trial court held, however, that the parties "did have in mind some deduction of this nature," and allowed a deduction in the sum of $400.30, determined by multiplying the amount of income taxes actually paid by the corporation, by the ratio of business done by the Roanoke branch to the total business done by the corporation and then multiplying that amount by one third. In other words, in the accounting between the parties the court charged plaintiff with the corporate income taxes actually paid by defendant on plaintiff's one third of the net profits of the Roanoke branch.

It is true that under generally accepted principles of accounting income taxes are not considered as operating expenses, but we agree with the trial court that under the facts and circumstances of this case the parties intended by the provision, "Federal, State and local taxes," that some allowance be made for these taxes. The amount allowed by the court is clearly fair and equitable, since plaintiff is only required to reimburse defendant for the amount of corporate income taxes actually paid on his share of the net profits of the Roanoke branch.

■ On the question of interest, Code § 8-223 provides in part, that: "In any suit in equity, * * * decree or judgment may be rendered for interest on the principal sum recovered, until such decree or judgment be paid * * *." We have recently said that under this provision, "The allowance of interest is in the sound discretion of the trial court." *Wolford* v. *Williams*, 195 Va. 489, 499, 78 S. E. 2d 660; *Beale* v. *Moore*, 183 Va. 519, 32 S. E. 2d 696. Under the circumstances of this case the trial court did not abuse its discretion in awarding interest from the date it determined the merits of the case.

■ The final question presented is whether the court erred in assessing one third of the costs in the trial court against plaintiff. The law applicable to this issue has been succinctly stated in *McLean* v. *Hill*, 185 Va. 346, 351, 38 S. E. 2d 583, as follows:

"It is true that generally speaking a court of equity has discretion 'over the subject of costs.' Code, sec. 3527 [now Code, § 14-174[2]]. But such discretion must be exercised soundly and in the light of the

result obtained in the litigation by the respective parties. We have several times said that in the exercise of this discretion the chancellor should award costs in favor of the party or parties 'substantially prevailing.' *Adkins* v. *Edwards*, 83 Va. 300, 307, 2 S. E. 435; *Harman* v. *Moss*, 121 Va. 399, 411, 412, 93 S. E. 609.

"See also, *Peters* v. *Waverly Water-Front Improv., etc., Co.*, 113 Va. 318, 325, 74 S. E. 168; *Williams* v. *Bond*, 120 Va. 678, 689, 91 S. E. 627; *Morison* v. *Dominion Nat. Bank*, 172 Va. 293, 303, 1 S. E. (2d) 292, 295, in which decrees of the lower court were modified or reversed because costs had not been awarded in accordance with this principle."

When this suit was instituted plaintiff did not know the total amount of his claim because most of the books and records of the business were in the possession of defendant; however, pursuant to his prayer for discovery plaintiff's accountant examined these records and reported that there was a total balance of $7,922.13 due plaintiff from defendant. On the other hand, defendant denied that it was indebted to plaintiff for any amount and alleged in its cross bill that plaintiff owed it a total of $888.91. In resolving these widely conflicting claims, the trial court held that defendant was indebted to plaintiff in the sum of $7,005.21. Consequently, we hold that plaintiff substantially prevailed in the trial court and that he is entitled to recover from defendant all costs by him in his behalf expended.

For the reasons stated the decree complained of will be modified to increase the total amount found to be due plaintiff from $7,005.21 to $7,376.93 (by the addition of $371.72 for depreciation of the automobile), and to award him all of his costs in the trial court. In all other respects the decree is affirmed.

*Modified and affirmed.*

---

[2] Code, § 14-174 provides:

"*How law of costs interpreted; discretion of courts of equity.*—The laws of costs shall not be interpreted as penal law; nor shall any thing in this chapter take away or abridge the discretion of a court of equity over the subject of costs, except as provided in § 14-178," which applies only to costs in this court.